GATLING *v.* SAMPSON, Etc.

[No. 275, September Term, 1965.]

*Decided April 4, 1966.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, MARBURY, BARNES and McWILLIAMS, JJ., and CARTER, J., Chief Judge of the Second Judicial Circuit, specially assigned.

*Marvin H. Smith,* with whom were *Webb & Travers* on the brief, for the appellant.

*Robert E. Farnell, 3rd,* and *George E. Bahen, Jr.,* for the appellee.

PRESCOTT, C. J., delivered the opinion of the Court.

This appeal involves unfortunate injuries received by a 5-year old child, while playing on, or near, a "street" in Cambridge, Maryland, on May 12, 1962, when the child and an automobile driven by the appellant, collided.

The question which we must decide is whether the evidence, considered in a light most favorable to the plaintiff, and the proper and legitimate inferences to be drawn therefrom are sufficient to establish a prima facie case of primary negligence on the part of the defendant.

It is difficult to obtain an accurate picture of the scene of the accident from the record: no photographs thereof were made, and the descriptions given by the witnesses are not easily deciphered. Also, it is impossible for an appellate Court to ascertain with accuracy what a witness means when he is testifying from a drawing on a blackboard and he uses such expressions as "from here to here," "it [the blacktop on the road] goes almost completely over on both sides except for the yards that start somewhere about here [indicating]" or "this pole to here," without further explanation.

The collision occurred on Cross Street, at about 5:30 p.m. on a clear, dry day in May. Cross Street, lined with small dwellings, is a macadam-surfaced, 2-way street running east and west; its width was not given, but an estimate or inference of about 21 feet was made for the entire right of way for the road. Toward the east from the scene of the accident at a distance of some 425 feet, it is intersected by Pine Street, which runs north and south. Shortly to the west of the scene Schoolhouse Lane comes into Cross Street from the south and dead-ends there. (One place in the testimony, seems to indicate to the contrary: that Schoolhouse Lane comes into Cross from the north. Whichever happens to be correct has little significance here.) The houses on Cross are constructed very close to the edge of the "street"; there are no concrete sidewalks or curbs to define the line between the "street" and the properties upon which the dwellings are built; however fences, in front of at least some

of the houses do run between the houses and the "street." What we are saying is that the best picture which we are able to obtain from the record is that Cross Street has something less than 20 feet of macadam running east and west. To the north this merges with some 4 to 6 feet of gravel and rocks (in the nature of a shoulder), which, in turn, merges with the property lines along which fences, at least in some spots, have been constructed. In the main, it is impossible to tell when the witnesses refer to the "street," whether they are referring to only the macadamized portion thereof or that portion plus the shoulders.

On the northern side of Cross (apparently slightly to the east of its intersection with Schoolhouse Lane) a utility pole is located "in the blacktop," or macadam (the distance from the edge of the macadam not being established). This pole was being used by the infant appellee and other children as the home-base for a game of hide-and-go-seek, which they were playing on the northern side of Cross. Just prior to the accident, the appellee, according to his own witnesses, was seen to run out from an alley to the pole.

Only two eye-witnesses to the collision were offered to establish primary negligence: one, Victor Dorsey, a child of 7 years as of the time of the collision; the other, Ruby Jackson, 12, and both were testifying at the trial 3 years thereafter. Dorsey said he was playing "catches," ("if he [another youth] catch'd me—tagged me—well, I would be the catcher"), with another youth about "one-house" away, and gave the following account of how the accident happened:

Q. Did you actually see the accident happen?
A. Yes, sir.
Q. Well, suppose you tell the ladies and gentlemen of the jury what you saw?
A. I saw Rodney was by the telephone pole. Then he made a step and see if any car was coming.
Q. Were any cars coming?
A. Yes, sir.
Q. What did Rodney do?
A. *He stepped into it and then he stopped.*
Q. And what happened then?

A. The car *had* hit him.

Q. Was he moving or standing still when he was hit?

A. Stand still.

Q. Did he at any time run in the street?

A. No, sir.

Q. Now, with whom was he playing?

A. With them children over to the—over in the other yard.

Q. Do you mean the yard on the same side of the street where he was standing?

A. Yes, sir.

Q. Well, were they out in the front yard?

A. Yes, sir.

Q. Now, if you will, step down from there and come up here to this table and illustrate for us * * *

(The witness left the witness stand.)

Q. Now, show us how close Rodney was standing to the telephone pole when the accident happened?

A. About this.

MR. FARNELL: Could we have the record show that he indicates about a foot?

BY MR. FARNELL:

Q. And you say he took a step and stopped when he saw the car?

A. Yes, sir.

Q. Show us how much of a step he took?

(The witness complied.)

MR. FARNELL: Could we have the record show that he indicates a forward movement of what—six inches to a foot?

BY MR. FARNELL:

Q. And is that where the accident happened?

A. Yes, sir.

This witness said he saw the appellant when he came out of Pine Street some 425 feet to the east; he later, in answer to a question as to how far the appellant's car was away when he first saw it, said that it was "near about at it [the place of collision]"; still later he again stated he saw appellant's car come out of Pine Street.

Ruby Jackson, the appellee's "sister" (probably half sister), gave, inter alia, the following testimony:

Q. Do you remember this accident that people have been talking about here today?

A. Yes.

\* \* \*

Q. What was Rodney doing?

A. Rodney was in the alley between two houses playing hide-and-go-seek.

Q. And what did he do?

A. He ran out from the alley, and the post that they were talking about was the place that he was supposed to tag.

Q. And when he ran out where did he go?

A. He stopped by the pole and he took a step to see if he saw a car coming.

Q. Did he at any time run into the street?

A. No, sir, he did not.

Q. Now, if you would step down from there and come over here to where I am?

(The witness left the witness stand.)

Q. All right.

Now, show the ladies and gentlemen of the jury—let's say this table is the telephone pole—show us how close Rodney was to the telephone pole at the time of the accident?

A. About like this.

MR. FARNELL: Could we have the record show that she indicated about what—nine inches to a foot?

\* \* \*

Q. Was he moving or standing still?

A. Standing still.

Q. You can go back to the stand now, Ruby.

(The witness resumed the witness stand.)

Q. Did you see this car coming?

A. Yes, I did.

Q. Where did it come from?

A. Pine Street.

Q. Now, were there other children playing out on Cross Street at this time?

A. Yes, there were.

Q. And do you remember the color of the car?

A. No, I do not.

Q. Did you see the man get out of the car after the accident?
A. Yes, I did.

\* \* \*

Q. Now, Ruby, were there any other cars coming down Cross Street at this time?
A. No, there wasn't.
Q. From either direction.
A. No.

\* \* \*

## CROSS-EXAMINATION.

BY MR. SMITH:

Q. You say these boys were playing hide-and-go-seek?
A. Yes.
Q. How many were there?
A. Round about five or six.
Q. And Victor Dorsey was one of them that was playing hide-and-seek?
A. I don't think he was. I didn't see him out there.

\* \* \*

Q. Now, where was your mother when the accident happened?
A. She was back in the kitchen.
Q. Were there any cars parked out there on the street?
A. Yes, there were.
Q. On the same side of the street that the accident happened on?
A. Yes.
Q. How many?
A. I would say round about three.
Q. How close were they parked to the scene of the accident?
A. Not too far down.
Q. Well, would they have been within a car's length or two car lengths of the scene of the accident?
A. Yes.
Q. Now, were they parked on the street side of the telephone pole or were they parked on the house side of the pole?
A. They were parked on the house side of the pole.

Q. Now, there were two boys chasing your brother, I believe?

A. Yes, there were.

Q. This little Sampson boy is your brother?

A. Yes, he is.

Q. And you didn't actually see the car coming, did you?

A. Yes, I did.

Q. Well, now Ruby, you remember being up in Mr. Farnell's office on September the 22nd of last year when this gentleman here, Mr. Dowds, took down what you said?

A. Yes, I was.

Q. And do you remember Mr. Lewis from my office being down there and asking you some questions?

A. Yes.

Q. And you remember he asked you this—'Maybe I asked this before, Ruby, but can you tell me again, if you would, did you see his car before he and Rodney came together'—and do you remember Mr. Lewis asking you that question?

A. Yes, sir.

Q. And do you remember what your reply was—you said, Ruby,—'No, I didn't'—you remember that?

A. I can't say I do.

Q. You remember Mr. Lewis then went on and asked you another question and he said—'You didn't notice the car coming'—you remember he asked you that?

A. I can't say.

Q. You remember you gave the reply—'No'?

A. Yes, I did.

Q. Uh-huh. *In other words, you didn't notice the car coming?*

A. *No, I didn't.*

* * *

Q. Then you didn't see the accident?

A. Yes, I did see the accident.

Q. *You saw the accident after it happened?*

A. *Yes, I did.*

Q. Uh-huh. *After you saw your brother was hit then you saw the accident?*

A. *Yes.*

Q. But you didn't actually see the car hit your brother?

[COLLOQUY]

THE WITNESS: Yes, I did.

Q. Well, in other words, Ruby, you have a different idea about the thing today than you had last September—is that what you are saying?

A. Yes.

Q. Well, when did you change your mind about the situation?

A. Well, I didn't exactly change my mind but I was reviewed before we came over to the court house.

Q. Who reviewed you?

A. Mr. Farnell and that gentleman that sat down a while ago.

Q. *And that's when you changed your mind, isn't it?*

A. Yes.

Appellee's mother was in the house at the time of the accident. She came out and found the child lying on the gravel at the side of appellant's car, which was in the "middle of the street." She put him in appellant's car, and they took the child to the hospital. Some two hours later after the child had been given sedatives, she asked him if he had run "into the street," and the child answered "no." This last testimony was admitted over objection; for the purposes of this case, we shall assume, without deciding, that it was admissible, because, under the circumstances, it adds little, if anything, to appellee's attempt to prove primary negligence.

The appellant testified he had lived within 4 or 5 blocks of the scene of the accident for some 30 years and had been driving a truck for a living for about the same period of time; he had turned right on Cross from Pine Street, driving his automobile on his way home; he was staying on the right of the road, for "driving for the law you can't run in the middle of the street"; when about 125 feet from the point of collision, he noticed some 5, or more, children playing in the "yards"; he didn't pay "too much attention" to them, but concentrated on the road ahead of him; suddenly, the appellee "run away" from the other children and ran in front of his car at a time when the front of his vehicle had passed the pole; he applied his brakes quickly

and heavily, but the child ran into his right front bumper and fender; had he been traveling fast, he would have killed the child; he was going about 15 to 20 miles an hour and stopped within a few feet after the collision; after the collision the child was in the gravel alongside the car; the mother came out of the house and said, 'I told you all [the children] to stay out of the street"; and the mother and he took the child to the hospital. This testimony of appellant has not been set forth with the view that it detracts from appellee's proof of primary negligence, but to show that appellant did not, by admission, add thereto, for the motion for a directed verdict was made by appellant at the close of all of the testimony.

An examination and an analysis of the evidence convince us that there is nothing therein upon which to base primary negligence except conjecture, pure and simple. The principle that the evidence and proper inferences therefrom must be considered in a light most favorable to the plaintiff when determining whether to take a case from the jury on the ground of no proof of primary negligence does not require the taking of isolated sentences, or parts of sentences, in the testimony, and construing them out of context, without any regard to the rest of a witness's testimony. The testimony to establish primary negligence must be credible; and that which is incredible should be disregarded. *Cocco v. Lissau,* 202 Md. 196; *York Motor Express Co. v. State,* 195 Md. 525; *Olney v. Carmichael,* 202 Md. 226. Cf. *So. Md. Electric v. Blanchard,* 239 Md. 481.

Appellee's theory seems to be that he has produced evidence from which the jury could find that he ran out to the pole, looked to his left, and saw appellant's car coming. He then stopped running, but took a short step to the south of the pole (no explanation is given as to why there was any occasion for his going south of the pole—the home base) and stood still; whereupon, appellant, with ample opportunity to have stopped his vehicle or to have swerved it to the left, ran straight into appellee at this point, the contention resembles a claim of last clear chance, a contention not here made).

The proof proffered in an attempt to establish the above was the testimony of a 7-year old playmate, and a 12-year old sister, taken 3 years after the accident. One said the appellee was

playing in the "front yard," without stating whether or not the "yard" was separated from the "road" by a fence; the other stated he was playing in an alley "between the houses." Appellee was being chased by 2 boys. We repeat the first version given by the 7-year old witness, Dorsey. Q. "* * * tell * * * the jury what you saw." A. "I saw Rodney was by the telephone pole. Then he made a step and [sic] see if any car was coming." Q. "Were any cars coming?" A. "Yes, sir." Q. "What did Rodney do?" A. "He *stepped* into *it* [the vehicle or the road?] and then he stopped." Q. "And what happened then?" A. "The car *had* hit him." Q. "Was he moving or standing still when he was hit?" A. "Stand [sic] still." Q. "Did he at any time *run* in the street?" A. "No, sir." (Emphasis added.) We fear that the jury would have had to have discovered a fourth inscription on the Rossetta Stone in order to have deciphered the above intelligently, or with any reasonable assurance of the accuracy of its interpretation.

We shall say little about the testimony of the sister. Apart from its vague and indefinite nature and the fact that it resulted, in good part, from leading questions, its value was greatly diminished, if not destroyed, when she testified *at the trial*, that she "didn't notice the [appellant's] car coming," and "after [she] saw her brother was hit then [she] saw the accident," and, although she had stated in her deposition that she "didn't notice the car coming," after she had been "reviewed" on the morning of the trial she had "changed her mind." To permit primary negligence to be based upon such evidence would, in our opinion, be allowing it to be based upon very risky, gambling speculation.

There was no testimony to establish excessive speed, reckless driving or the drinking of alcoholic beverages on the part of the appellant. And the physical facts were consistent with a conclusion that appellant was proceeding at a moderate rate of speed on his right side of the road and keeping a proper look out (his car stopped within a few feet after the impact according to witnesses from both sides). Both of appellee's eye-witnesses agreed that he "ran" out to the pole. He was being chased by two boys, but no one offered an explanation as to why he was proceeding (whether running, walking, or standing

still) south of the pole, which was past the home-base. The case, we think, falls squarely within the purview of such cases as *Olney v. Carmichael, supra,* wherein it is stated:

> "We find that the testimony of Leverette [a witness] is too inconclusive, uncertain, vague, and contradictory to furnish a rational basis for a finding of negligence. * * *. * * * if any witness's testimony is itself so contradictory that it has no probative force, a jury cannot be invited to speculate about it or to select one or another contradictory statement as the basis of a verdict." See also *Eisenhower v. Balto. Transit Co.,* 190 Md. 528, and *Moulden v. Greenbelt Consumer Services, Inc.,* 239 Md. 229.

The appellee relies very heavily upon the rather early case of *Ottenheimer v. Molohan,* 146 Md. 175 (1924), but that case is readily distinguishable. There, the facts permitted an inference of excessive speed of a vehicle driven very close to the right edge of a highway by an operator who had seen (or could have seen), for a distance of some 30 feet or more, small children "skylarking" on a cinder apron very close to the edge of the highway. No such situation is shown here. In the instant case, the children were playing in the "yard" (whether behind a fence or not is not shown), or in an "alley between the houses." As stated above, no evidence was offered of excessive speed, reckless driving, or other violation of the motor vehicle laws, which contributed to the accident.

We hold that the trial judge should have granted the appellant's motion for a directed verdict.

*Judgment reversed, without a new trial; appellee to pay the costs.*