## LUSBY *v.* FIRST NATIONAL BANK OF MARYLAND

[No. 70, September Term, 1971.]

*Decided November 15, 1971.*

The cause was argued before HAMMOND, C. J., and MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Bernard P. Jeweler,* with whom were *Gordon H. Levy* and *Edelman, Levin, Levy & Rubenstein* on the brief, for appellant.

*Paul V. Niemeyer,* with whom were *Jesse Slingluff* and *Piper & Marbury* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

Appellant, Elizabeth Lusby, was disappointed when she did not receive the proceeds of a savings account at

First National Bank of Maryland (the Bank) upon the death of her aunt, Lottie Mack. She sued the Bank. A Baltimore City jury returned a verdict in her favor. The trial judge entered judgment *n.o.v.* in favor of the Bank. We shall affirm that judgment.

Mrs. Lusby's declaration asserted "that on August 10, 1962, a joint savings account was opened by Lottie Mack and Elizabeth Lusby under Account No. 12026150, subject to the order of either, balance to belong to the survivor," and that after the death of Mrs. Mack in 1968 the Bank refused to honor the request of Mrs. Lusby for payment of the balance of the account.

There was presented in evidence a signature card with the names and signatures of Mrs. Lusby and Mrs. Mack on it. There had been placed on it with a rubber stamp the language:

"IN TRUST FOR ............. SELF AND [space] JOINT OWNERS, SUBJECT TO ORDER OF EITHER, THE BALANCE AT DEATH OF EITHER TO BELONG TO THE SURVIVOR."

The name "Elizabeth Lusby" was written to the left of the rubber stamp.[1] The names "Mack, Lottie" and "Lusby, Elizabeth" were typed at the top of the card. The typewritten name of Mrs. Lusby and the signature of Mrs. Lusby written to the left of the rubber stamp together with the legend from the rubber stamp had been stricken with a typewriter. An address of 4139 Mountwood Road appeared. It had been struck through in ink and replaced by the address of 402 Ringneck Ct., Reisterstown, Md. In the upper right-hand corner of the card opposite "NO." appeared "25609". This number appears to have had a series of question marks typed over it. Below that has been typed the number "12026150" or "12-26150".[2] In the lower right-hand corner of the card op-

---

1. Nothing was placed in the space before "SELF" nor in the blank space before "JOINT OWNERS".

2. Both an "0" and a "-" have been typed as the third character. It is impossible to tell which was meant. The legend "12026150" appears on the audit requests and information returns to which

posite the legend "Introduced By" appears "Trans from Sav. #23973". At the bottom of the card in pencil appears "OPENED 8-10-62 CLF". On the back of the card there has been written in pencil "11/2/61", without any explanation. This card is yellow.

A second card, white in color, was introduced. It does not have any printing on the back similar to that on the yellow card relative to the Bank's being authorized to recognize signatures etc., nor does it have all of the printing relative to residence, occupation, birthplace, nearest relative, "Introduced By", etc., appearing on the face of the yellow card. At the top has been typed "Mack, Lottie". The rubber stamp "IN TRUST FOR ............... SELF AND [space] JOINT OWNERS, SUBJECT TO ORDER OF EITHER, THE BALANCE AT DEATH OF EITHER TO BELONG TO THE SURVIVOR" which appears on the front of the yellow card also appears. In the space between the word "AND" after "SELF" and a line below that beginning "JOINT OWNERS" appears "Lusby, Elizabeth". Both Mrs. Mack and Mrs. Lusby signed the card. In the upper right-hand corner appears "25609". At the bottom of the card there is written in pencil "closed 8/10/62".

Testimony of the branch manager of the main office of the Bank indicated that the number "12" appearing as a part of the number for account No. 1226150 represented the branch of the bank.

A copy of a withdrawal ticket signed by Mrs. Mack under date of August 10, 1962, for account No. 12-25609 was placed in evidence. This was in the amount of $5,-164.62. Also admitted in evidence were a copy of a deposit ticket showing that on August 10, 1962, Mrs. Mack deposited in account No. 12-26150 the sum of $5,164.62 and a copy of the passbook for that account. This deposit ticket and the passbook were in the name of Lottie Mack only. The name "Lottie Mack" on the deposit ticket is

reference is later made. The passbook and deposit slip to which reference is later made show number "12-26150". The inference is drawn that in some instances a dash and in other instances a zero was used to separate the symbol for the branch ("12") from the number of the account.

handwritten. It appears to have been written by the same person who signed the withdrawal slip. The passbook showed the account as having been opened on August 10, 1962, with a deposit of $5,164.62. It showed interest credited periodically. The only other transactions were a withdrawal on June 27, 1966, of $666.76 and the final closing of the account on October 2, 1968, with the withdrawal of $5,701.82. The evidence showed that Mrs. Mack died on August 19, 1968.

Also placed in evidence were U. S. information tax returns for the calendar years 1963, 1964, 1965, 1966, 1967, and 1968. Each of these pertained to account No. 120-26150 at the Bank. Each was addressed:

"MS. LOTTIE MACK
MS. ELIZABETH LUSBY
402 RINGNECK CT.
REISTERSTOWN, MD"

Requests for verification of balance from the auditors of the Bank referring to account No. 12026150 dated July 16, 1964, April 20, 1965, and March 1, 1968, were also introduced into evidence. They were similarly addressed to Mrs. Mack and Mrs. Lusby at the Ringneck Ct. address.

Mrs. Lusby testified that "about a month or so after her [aunt's] death" she went to the Bank. The record at that point is as follows:

"Q. All right. And who did you see at the bank? A. I don't know the gentleman's name, but I spoke to someone there, and I explained to them that I was on a joint account, and that my aunt had died, and what was the procedure that I should follow. He got the signature card and he said as far as he was concerned, there was no problem; it was a joint account, and that the money would be mine. And he asked me about the pass book. And I told him that I didn't have it, that my aunt's lawyer had all her val-

uables and the pass book and so on. But he was in the hospital and couldn't be reached. So he told me to return to the bank with the transcript of her death, and I did that after about two weeks. And I spoke to another gentleman at the bank. It was a different one. And he also told me the same thing, that there was no problem, that the money was in—it was a joint account, and it was in my name, and that all I need to do would be to claim physical loss of the pass book and just have the money transferred from one account to the other. And that's the way I left it.

"Q. Now, did there come a time when they refused to give you the money? A. Yes—Well, I never—I never asked for the money, but I was told later on that the money did not belong to me; that she had made a mistake.

"Q. How much money was in that account at the time of your aunt's death? That would be $5592.02? A. Yes. That sounds —

"Q. And you never did receive any money from the First National Bank under this account? A. No.

"Q. Or any other account? A. No.

"Q. Is that social security number on the signature card your social security number? A. Yes.

"Q. And that has your name and address and your age, et cetera? A. Yes."

Only two witnesses testified, Mrs. Lusby and the branch manager of the Bank. Mrs. Lusby said that around the summer of 1963 her aunt, Mrs. Mack, asked her to sign a signature card at the First National Bank. She pinpointed the date by saying that it was after the death of her mother in December, 1962, and that her aunt spoke to her at that time about putting her name on the joint account. She identified the signature card

as the one that she thought she signed in 1963. She stated unequivocally that the only time Mrs. Mack ever discussed the account with her was when the signature cards were signed, that the money that went into the account was not Mrs. Lusby's, that all of the money was Mrs. Mack's, that Mrs. Lusby made no contribution to the funds in the account, that she did not report as income the interest recorded on the information tax returns she had received, that she never had the passbook for the account, and that she never made any withdrawals from the account. Mrs. Lusby said that she lives at 402 Ringneck Court in Reisterstown, the address on the signature card. Copy of a settlement sheet was presented indicating that she and her husband settled for this home on August 1, 1962. Prior to that she lived at 4139 Mountwood Road, the address on the signature card which had a line through it.

Mrs. Sharp testified from an examination of the signature card that the account in the name of Mrs. Mack and Mrs. Lusby was opened November 2, 1961, being account No. 1225609 and that that account was closed on August 10, 1962, when Mrs. Mack withdrew the sum of $5,164.62 and opened a new account in that amount in her own individual name, account No. 1226150. She said the records of the Bank showed no account subsequent to August 10, 1962, in the joint names of Mrs. Lusby and Mrs. Mack, and the Bank never received a signature card containing the signature of Mrs. Lusby subsequent to November 2, 1961. She further testified that the name of Mrs. Lusby on the signature card was crossed out when account No. 1225609 was closed and the new account opened on August 10, 1962, although she conceded that she had seen the signature card for the first time the week immediately prior to her testimony. She further testified upon examination by the court that the usual procedure in closing one account and opening a new one would be to have a new signature card prepared. She said the yellow card (the one on which the signature of Mrs. Lusby was crossed out, with "25609"

eliminated and "12026150" placed thereon) is the account card and the white card (the one with "25609" on it and no elimination of signatures) is a cross-file.

In considering the motion for judgment *n.o.v.*, the evidence and the reasonable inferences to be drawn from it must be considered in the manner most favorable to the party opposing the motion. *P. Flanigan & Sons v. Childs,* 251 Md. 646, 653, 248 A. 2d 473 (1968).

In *Jones, Adm. v. Hamilton, Adm.,* 211 Md. 371, 127 A. 2d 519 (1956), Judge (now Chief Judge) Hammond said for the Court:

> "The distillation of the Maryland cases is that in a contest between those claiming as co-owners or as surviving owner of a bank or building association account, the Court has sought to find who was the original owner of the money on deposit, the intention of the owner as to the fund, the mechanics employed to effectuate that intent, and their effectiveness. If the mechanics are adequate to effectuate the intent, the Court will gratify the intent, whether or not the trust form has been used." *Id.* at 380.

Mrs. Lusby sees *Sturgis v. Citizens Nat. Bank,* 152 Md. 654, 137 A. 378 (1927), and *Wetzel v. Collin,* 170 Md. 383, 185 A. 117 (1936), as supporting her position. *Sturgis* involved a situation where a man desired to set up a bank account for a niece. The original deposit was made in the names of Sturgis and his niece "in trust for both, joint owners", subject to his order with "the balance at the death of either to go to the survivor". When the officers of the bank became doubtful of the effectiveness of this form which had been suggested by them, they called depositors who had made use of it to come in to make a change. Sturgis consented that another form recommended by the bank officers should be adopted for his deposit. No check was drawn on the account in the one form to redeposit it with the other wording. The change was made by an entry in the bank ledger only.

The form there entered was in the name of him and his niece "in trust for both, joint owners, subject to the check of either, balance at the death of either to go to the survivor." A passbook was made out in the first form and placed among the donor's papers regularly kept at the bank. It was not changed and was not taken out until his death. He never drew any money from the deposits. The Court said:

> "It is quite clear that the legal effect of the form of deposit adopted was fully explained to the donor, and especially that he was told that Mrs. Foulke could draw the money at any time; and quite clear that he deliberately adopted the legal consequences of the form of gift he was attempting to make. No signature card was ever procured from Mrs. Foulke. The fund merely lay untouched, accumulating interest, until the death of Mr. Sturgis. * * *
>        * * *
> "The objection to the gift for informality in its creation, we have not found well taken. It does not seem essential to the change of the title to the deposit that the depositor go through the form of withdrawing and redepositing it by checks. A trust of personalty may be created and proved by parol. *Stone v. Nat. City Bank,* 126 Md. 231, 238; *Taylor v. Henry,* 48 Md. 550, 560. The depositor here had full power to make the change, clearly intended that it should be made as it was made, and so expressed himself, and checks could have added nothing but written evidence of the transaction with which both parties were satisfied as it was. And so with the objection that the final entry was not made on a pass-book, either the old one or a new one, as well as on the ledger. Both parties accepted the ledger entry and were bound by it, and that completed the change. The use of

checks and a pass-book entry might have been better in practice, for the clear, written evidence of the transaction it would provide, but the law does not require that evidence. See *Smith v. Darby*, 39 Md. 268, 278." *Id.* at 657-58.

In *Wetzel* an account was opened in the name of sisters, Emma and Alice, as "joint owners, subject to the order of either, balance at the death of either to belong to the survivor." Subsequently, according to the records of the association, the name of Alice was stricken from the share book and the account continued in the name of Emma. The account had been opened by Emma at Alice's direction with the funds of Alice. The passbook was found in the possession of the association after the death of Emma. On it a line had been drawn through the name of Alice, leaving only the name of Emma. The chancellor, apparently without opinion, found in favor of Alice, the case having been decided before the days of Maryland Rule 18 c and what was then Code (1924) Art. 16, § 192 not being applicable to Baltimore City where the matter was tried. Judge (later Chief Judge) Sloan said for the Court:

"The chancellor, in our opinion, decided the ownership of the fund in favor of [Alice] for either of two reasons; one, that there had been no change in the account; the other, that there was no proof that either of the two parties had authorized it." *Id.* at 388.

He then went on to say:

"The omission or want of any proof that the change was made by the authority of any one having the power or authority so to do was decisive with the chancellor, and is so with us." *Id.* at 390.

It thus will be seen that both *Sturgis* and *Wetzel* present vastly different cases from that with which we are

here concerned. This account as originally set up constituted a revocable trust. When one traces through the opening of the account with Mrs. Lusby; the addresses on the cards, comparing those addresses with where Mrs. Lusby lived at certain times; the changing of account numbers on the signature card, noting the legend on the cards relative to opening and closing; the withdrawal from account No. 12-25609 on August 10 signed by Mrs. Mack; the opening of a new account in the name of Mrs. Mack only, in the same amount on the same day with the savings account deposit slip appearing to be in her handwriting and having on it only her name, followed by a passbook issued on that date in the name of only Mrs. Mack for account No. 12-26150, it becomes obvious that Mrs. Mack, for what reason we do not know and is not important to the decision here, elected to terminate the trust and to place the account in her own, individual name. There has been no showing of any kind, or even an intimation, that the evidence of the withdrawal slip, the deposit slip, and the passbook are anything other than bona fide records made at the time.

Mrs. Lusby thinks she sees a way out by invoking the doctrine of equitable estoppel. She points to the definition of the term appearing in 3 *Pomeroy's Equity Jurisprudence* § 804 (5th Ed. Symons 1941) where it is said:

> "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy." *Id.* at 189.

As she says, the definition has been cited with approval in Maryland. She calls attention to *Savonis v. Burke,* 241

Md. 316, 216 A. 2d 521 (1966), and *Bayshore Industries v. Ziats*, 229 Md. 69, 181 A. 2d 652 (1962).

An analysis of the Maryland cases cited by the author is interesting. He cites *Pearre v. Grossnickle*, 139 Md. 1, 114 A. 725 (1921), and *Rodgers v. John*, 131 Md. 455, 102 A. 549 (1917). Our predecessors refused to apply the doctrine in each case. In *Pearre* the decedent bequeathed household furniture to his wife. The remainder of the estate went to a trustee for the benefit of five infant children. In the will he claimed to have made adequate provision for his wife in her lifetime, mentioning specifically their "mansion house". That real estate was actually owned by the parties as tenants by the entireties. The remaining property was described by the Court as "acquired by the wife largely, if not altogether, through the financial aid of her husband." Testimony was presented relative to conversation at a hospital when the will was executed about seven months before the death of the testator. The Court said:

> "The evidence in this case fails to prove a contract by which the gifts from Mr. Grossnickle to his wife were made and accepted as in lieu of her interest or dower in his estate.
>
> "But the further contention is made by the defendants that Mrs. Grossnickle is estopped from participating in the distribution of said fund (1) because of her participation in the administration of the personal estate, (2) because of her failure to make any claim to the proceeds of the sale of a farm of the estate made by Mr. Pearre as testamentary trustee, and (3) because she received from Mr. Pearre for the use of her children certain rentals collected by him from a house belonging to the estate of her husband."
> *Id.* at 8.

Judge Pattison, after quoting the definition of equitable estoppel from *Rodgers v. John, supra,* said for our predecessors in declining to apply the doctrine:

"It is evident that no one was misled to his injury because of the facts upon which such contention is founded, and consequently the rights of Mrs. Grossnickle were not affected thereby." *Id.* at 9.

In *Rodgers* real estate on North Calvert Street in Baltimore was conveyed to a trustee in 1894. An equitable life estate was reserved to the grantor in that deed. He remained in possession of the property for a number of years. When he sold his business to John he recited that he was the owner of the property at 409 North Calvert Street and purported to execute a lease. It was the contention of John after the death of the grantor that the trustee, although he had not signed the contract or the lease, was bound by their provisions under the doctrine of equitable estoppel and thus "precluded from asserting any right to the property in prejudice of what [John] claim[ed] to be his unexpired term of [a] ten-year extended lease." He contended that the trustee prepared the contract of sale and the estoppel was alleged to rest principally upon the statement in the contract of sale that Rodgers was the owner of the property "taken in connection with the conduct of [the trustee] at the time the contract and lease were executed." There, in holding that the essential elements of equitable estoppel had not been made out, the Court said in part:

"The contract of sale and the lease were signed in Mr. Benzinger's office. He represented Mr. Rodgers and Mr. Hennighausen was counsel for Mr. John, and was present when the papers were signed. Mr. Benzinger said that his recollection was that the papers were prepared by Mr. Hennighausen, or in his office, and were sent over to him for approval, and that he did approve them and made an interlineation in the contract of sale. The proof fails to show that Mr. Benzinger made any written or verbal declaration which could or did mislead Mr. John.

As the transaction took place about twelve years after the execution of the deed of trust, the most that could be claimed is, as stated in the appellee's brief, that the deed had passed out of Mr. Benzinger's recollection. But regardless of this, there is not a particle of evidence from any source that Mr. John relied on or was induced to sign the contract by the statement contained in the contract of sale that Rodgers was the *owner* of the property, a statement which he or his counsel could have readily found to have been untrue. In *Smith v. Cleaver,* 126 N. W. 589, which follows and adopts *Sutton v. Consolidated Apex Manufacturing Company,* 15 S. D. 410, *s. c.* 89 N. W. 1020, it was held it was not sufficient to show that the language, act or conduct of one might have misled a party to his prejudice, but it must affirmatively appear that such party was in fact misled or induced by such acts, conduct or language to do something which he would not have otherwise done." *Id.* at 464. (Emphasis in original.)

The question that immediately comes to mind with reference to this case when *Rodgers* is read is what affirmative evidence has Mrs. Lusby presented to show that she was in fact misled or induced by act, conduct, or language of the Bank to do something which she would not otherwise have done?

As Judge Barnes put it for the Court in *Savonis* in reviewing the Maryland cases on the subject:

"It is essential for the application of the doctrine of equitable estoppel that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the representations of the parties sought to be estopped." *Id.* at 319.

Where it is manifest to the court upon the plaintiff's own showing in the uncontradicted evidence in the case that there is no rational ground upon which a verdict can be based for the plaintiff, it becomes the duty of the court to direct a verdict for the defendant, or, as in this case, grant a motion for a judgment *n.o.v.* in favor of the defendant. *Stoskin v. Prensky,* 256 Md. 707, 716, 262 A. 2d 48 (1970) ; *Schaub v. Community Cab, Inc.,* 198 Md. 216, 223, 81 A. 2d 597 (1951) ; and *Eisenhower v. Balto. Transit Co.,* 190 Md. 528, 532, 59 A. 2d 313 (1948).

The trial judge was fully justified in this case in granting the motion for judgment *n.o.v.* As the trial judge put it, "The mere fact that representations were made to Elizabeth Lusby that she was the joint owner of savings account # 12-26150, when in fact she was not, could not [in the circumstances] confer upon her any right to something which was not in fact hers." There is no rational ground upon which it could be determined that Mrs. Lusby is in fact the owner of the account nor has she presented evidence of how she has been misled to her injury and changed her position for the worse because of her reliance on the representation of the Bank which would entitle her to invoke the doctrine of equitable estoppel.

*Judgment affirmed; appellant*
*to pay the costs.*