GARY J. COFFEY ET AL. *v.* THE DERBY STEEL
COMPANY, INC. ET AL.

[No. 107, September Term, 1980.]

*Decided September 11, 1981.*

242

*Motion for reconsideration filed October 13, 1981; denied October 23, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*John T. Enoch* and *H. Patrick Donohue* for appellants.

*David M. Buffington,* with whom were *Semmes, Bowen & Semmes* on the brief, for appellee The Derby Steel Company, Inc., and by *Sidney Blum* for Schafer Testing Laboratories, Inc., other appellee.

SMITH, J., delivered the opinion of the Court. COLE, J., concurs in Parts i, ii and iii and dissents from Part iv.

Two questions are presented in this case: (1) Whether appellee Derby Steel Company, Inc., is a statutory employer under Maryland Code (1957) Art. 101, § 62 and thus immune from any liability to appellant Gary J. Coffey other than for workmen's compensation, and (2) whether Coffey et al. established any liability to them on the part of appellee Philip E. Schafer Testing Laboratories, Inc. We shall hold that Derby is a statutory employer and that Schafer's liability was not established.

### i   The background

Coffey was injured on the job at the construction site of the Careers Center Building at Anne Arundel County Community College on June 8, 1972. He was employed as a steel erector by The Prosser Company. Compensation under the Workmen's Compensation Act was paid to Coffey by Prosser's insurer. Derby held a subcontract to furnish and erect the structural steel for the building. It contracted with Prosser to do the actual erection.

Coffey and his wife sued Derby; R.T.K.L. Associates, Inc., the architect; and Schafer. The declaration alleged, among other things, that Derby was "engaged in the design, manufacture and sale of structural steel used in buildings such as the one under construction at Anne Arundel Community College," Coffey's fall by which he was injured, and that this fall "was caused by the carelessness, recklessness, negligence and wanton disregard of the rights of [Coffey] by [Derby], through its agents, servants and/or employees" in a

number of regards. It was alleged that the architect failed "to use proper care in the design of steel beams," etc. The declaration said that Schafer "was engaged [in] and undertook to perform inspection and testing work which included the responsibility to inspect and test the design and manufacture of all steel beams used in said construction by structural iron workers such as . . . Coffey [ ] so that said steel beams would be free from defects and irregularities that made their use unsafe and unfit for incorporation into the building under construction," and that Coffey's fall "was caused by the carelessness, recklessness and negligence and wanton disregard of the rights of [Coffey] by . . . Schafer [ ] through its agents, servants and/or employees" in a number of regards. Mrs. Coffey joined in a count to recover for a loss of consortium.

The Circuit Court for Anne Arundel County granted Derby's motion for summary judgment. The trial judge made the finding required by Maryland Rule 605 a which permitted an appeal prior to the end of the whole case. The Court of Special Appeals affirmed in an unreported opinion. The case reached us in *Honaker v. W.C. & A.N. Miller Dev. Co.,* 285 Md. 216, 401 A.2d 1013 (1979) (*Honaker II*), being consolidated for purposes of argument and opinion with the case of Dallas A. Honaker et ux. v. W.C. & A.N. Miller Development Company. We reversed and remanded for trial. We concluded the opinion by stating:

> The sum total of that which was before the trial judge on the motion for summary judgment is susceptible of an inference that Derby is no longer engaged in "the trade, business or occupation" of steel erection. Accordingly, the matter should be tried so that a finding of fact may be made as to whether Derby is in the steel erection business. [*Id.* at 232-33.]

The case was fully tried. A directed verdict was entered in favor of the architect from which no appeal has been entered. The case was submitted to the jury on issues. A substantial verdict was returned against Derby and Schafer. The trial

judge entered judgment n.o.v. in favor of Derby and Schafer against Coffey on the ground that Coffey was contributorily negligent and as to Derby on the additional ground that Derby was Coffey's statutory employer. Coffey appealed to the Court of Special Appeals. Because there seemed to be some misunderstanding relative to our earlier opinion, we granted Coffey's petition for the writ of certiorari prior to the time the case was heard in the Court of Special Appeals. We shall not place our decision here as to Schafer on the ground of contributory negligence. In the course of our discussion we shall develop such additional facts as may be requisite. As we shall develop, that which was before the trial judge on the motion for judgment n.o.v. was not a carbon copy of that which he considered on the motion for summary judgment.

### ii   The law

We have here essentially two cases, the one against Derby and the one against Schafer. Two principles of law are applicable to both cases.

The first such principle is the standard for appellate review of a judgment n.o.v. We consider the evidence and the reasonable inferences to be drawn from it in the light most favorable to the party opposing the motion — here, Coffey. *Wesko v. G.E.M., Inc.,* 272 Md. 192, 200, 321 A.2d 529 (1974), and *Lusby v. First Nat'l Bank,* 263 Md. 492, 499, 283 A.2d 570 (1971). This has its limitations, as pointed out by Chief Judge Prescott for the Court in *Gatling v. Sampson,* 242 Md. 173, 218 A.2d 202 (1966):

> The principle that the evidence and proper infer-
> ences therefrom must be considered in a light most
> favorable to the plaintiff when determining
> whether to take a case from the jury on the ground
> of no proof of primary negligence does not require
> the taking of isolated sentences, or parts of sen-
> tences, in the testimony, and construing them out of
> context, without any regard to the rest of a wit-
> ness's testimony. The testimony to establish pri-

mary negligence must be credible; and that which is incredible should be disregarded. *Cocco v. Lissau,* 202 Md. 196 [, 95 A.2d 857 (1953)]; *York Motor Express Co. v. State,* 195 Md. 525 [, 74 A.2d 12 (1950)]; *Olney v. Carmichael,* 202 Md. 226 [, 96 A.2d 37 (1953)]. Cf. *So. Md. Electric v. Blanchard,* 239 Md. 481 [, 212 A.2d 301 (1965)]. [*Id.* at 182.]

In reviewing the granting or denial of a motion for summary judgment, all inferences also must be resolved against the moving party. If the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law, then the judgment sought shall be rendered forthwith. Maryland Rule 610 d 1. In *Honaker II,* 285 Md. at 231, we pointed this out and said that there all inferences were required to be considered in a light most favorable to Coffey. The fact that the inferences there were required to be so resolved does not make the review here of the granting of judgment n.o.v. precisely the same as the review of the granting of summary judgment, however. It is true that we said in *Porter v. General Boiler Casing Co.,* 284 Md. 402, 396 A.2d 1090 (1979):

> The function of the trial judge on such a motion is said to be much the same as that which he performs at the close of all the evidence in a jury trial when motions for a directed verdict or requests for peremptory instructions require him to determine whether an issue requires resolution by a jury or is to be decided by the court as a matter of law. *Washington Homes* [*v. Inter. Land Dev.,* 281 Md. 712,] 716 [, 382 A.2d 555 (1978)]; *Lynx, Inc. v. Ordnance Products,* 273 Md. 1, 8, 327 A.2d 502 (1974); and *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 41, 300 A.2d 367 (1973). Moreover, "even where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences

> should not be made as a matter of law, but should be submitted to the trier of fact." *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138, 265 A.2d 256 (1970), and cases there cited. It follows, accordingly, that if there is a conflict between the inferences which may be drawn from that before the court, summary judgment is not proper. [*Id.* at 413.]

However, as we pointed out in *Berkey v. Delia,* 287 Md. 302, 326, 413 A.2d 170 (1980), quoting the opinion for the Court by Judge Emory H. Niles in *Tellez v. Canton R. R.,* 212 Md. 423, 430, 129 A.2d 809 (1957), "the function of the summary judgment procedure is not to try the case or to decide issues of fact. It is merely to determine whether there is an issue of fact to be tried, and if there is none, to cause judgment to be rendered accordingly." Such procedure is not a substitute for trial. Also, as Judge Digges pointed out for the Court in *Metropolitan Mtg. Fd. v. Basiliko,* 288 Md. 25, 28, 415 A.2d 582 (1980), a trial court "ordinarily, does possess discretion to refuse to pass upon, as well as discretion affirmatively to deny, a summary judgment request in favor of a full hearing on the merits; and this discretion exists even though the technical requirements for the entry of such a judgment have been met." For somewhat similar discussion, see *Smith v. Blackledge,* 451 F.2d 1201, 1202 n.1 (4th Cir. 1971), and *Pierce v. Ford Motor Co.,* 190 F.2d 910, 915 (4th Cir.), *cert. denied,* 342 U.S. 887 (1951).

Credibility is not an issue to be determined on summary judgment. In granting or denying a motion for summary judgment, a judge makes no findings of fact. Such is not the purpose of summary judgment. It is sharply contrasted with a motion for a directed verdict or a motion for judgment n.o.v., both of which test the legal sufficiency of the evidence adduced. See the discussion and cases cited by Judge Orth for the Court in *Impala Platinum v. Impala Sales,* 283 Md. 296, 326, 389 A.2d 887 (1978).

The second point which is important to the case of each appellee is that a plaintiff is bound by the uncontradicted evidence he adduces, even out of the mouth of an adversary.

We said in *Lusby v. First Nat'l Bank,* 263 Md. 492, 283 A.2d 570 (1971):

> Where it is manifest to the court upon the plaintiff's own showing in the uncontradicted evidence in the case that there is no rational ground upon which a verdict can be based for the plaintiff, it becomes the duty of the court to direct a verdict for the defendant, or, as in this case, grant a motion for a judgment *n.o.v.* in favor of the defendant. *Stoskin v. Prensky,* 256 Md. 707, 716, 262 A.2d 48 (1970); *Schaub v. Community Cab, Inc.,* 198 Md. 216, 223, 81 A.2d 597 (1951); and *Eisenhower v. Balto. Transit Co.,* 190 Md. 528, 532, 59 A.2d 313 (1948). [*Id.* at 506.]

To similar effect see *Wesko,* 272 Md. at 199; *McCarty v. City of Baltimore,* 265 Md. 423, 428, 290 A.2d 521 (1972); *Williams v. Wheeler,* 252 Md. 75, 79, 249 A.2d 104 (1969); and *Trusty v. Wooden,* 251 Md. 294, 297-98, 247 A.2d 382 (1968). Relative to an adverse witness called by a party, Judge Prescott said for the Court in *Proctor Electric Co. v. Zink,* 217 Md. 22, 141 A.2d 721 (1958):

> It is unquestionably the general rule that a person who produces a witness vouches for him as being worthy of credit, and no direct attack upon his veracity should be made by the party who produces him in the absence of surprise, hostility or deceit. *Murphy v. State,* 120 Md. 229 [, 87 A. 811 (1913)]; 3 Jones, *Evidence Civil Cases,* (4th Ed.) secs. 853, 854. In Maryland, we have a statute, Article 35, section 9, Code (1957), which relates to adverse *parties.* It provides that they may be called by the opposite party and interrogated by leading questions, contradicted and impeached. Under this statute, when adverse parties have been called and their testimony not contradicted, this Court has held that the uncontradicted testimony was binding on the party who had called the opposite party. *Morris v. Hazlehurst,* 30 Md. 362 [(1869)]; *Mason v.*

*Poulson,* 43 Md. 161 [(1875)]; *Harrison v. Harrison,* 117 Md. 607 [, 84 A. 57 (1912)]; *Murphy v. Stubblefield,* 133 Md. 23 [, 104 A. 259 (1918)]; *Maszczenski v. Myers,* 212 Md. 346 [, 129 A.2d 109 (1957)].* We think this is the settled law of Maryland today, and we have no desire to recede from any of these decisions. [*Id.* at 32 (emphasis in original).]

*See also Larsen v. Romeo,* 254 Md. 220, 225, 255 A.2d 387 (1969); *Ackerhalt v. Hanline Brothers,* 253 Md. 13, 22, 252 A.2d 1 (1969); *Vokroy, Adm'r v. Johnson,* 233 Md. 269, 272, 196 A.2d 451 (1964), and the Maryland cases cited in each.

### iii Derby

Derby interposed a plea based upon Art. 101, § 62. It provides:

When any person as a principal contractor, undertakes to execute any work which is a part of his trade, business or occupation which he has contracted to perform and contracts with any other person as subcontractor, for the execution by or under the subcontractor, of the whole or any part of the work undertaken by the principal contractor, the principal contractor shall be liable to pay to any workman employed in the execution of the work any compensation under this article which he would have been liable to pay if that workman had been immediately employed by him; and where compensation is claimed from or proceedings are taken against the principal contractor, then, in the application of this article, reference to the principal contractor shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the workman under the employer by whom he is immediately employed.

Where the principal contractor is liable to pay compensation under this section, he shall be entitled to indemnity from any employer, who would have been liable to pay compensation to the employee independently of this section, and shall have a cause of action therefor against such employer.

Nothing in this section shall be construed as preventing a workman from recovering compensation under this article from the subcontractor instead of from the contractor.

Whenever an employee of a subcontractor files a claim under this article against the principal contractor, the principal contractor shall have the right to join the subcontractor or any intermediate contractors as defendant or codefendant in the case.

The Workmen's Compensation Act as enacted by Chapter 800 of the Acts of 1914 was found to contain a major loophole in that an employer, by entering into a subcontract for the performance of parts of an entire project, could escape liability under the act. Accordingly, the numerous revisions embodied in Chapter 597 of the Acts of 1916 included a new section which became the present § 62.

If Derby in this case is "a principal contractor" who has "undertake[n] to execute any work which is part of his trade, business or occupation," a part of which he has contracted with some "other person as subcontractor" to perform, then under §§ 62 and 15 of the Workmen's Compensation Act the exclusive remedy of Coffey would be under that Act. *Roland v. Lloyd E. Mitchell, Inc.*, 221 Md. 11, 13, 155 A.2d 691 (1959), and cases there cited. On the other hand, if Derby is not a statutory employer of Coffey, then Coffey may maintain the tort action here for alleged negligence in accordance with § 58 of the Workmen's Compensation Act.

In *Honaker II* we examined the background of this statute. 285 Md. at 222-25. We pointed out that in *Honaker v. W. C. & A. N. Miller Dev. Co.*, 278 Md. 453, 365 A.2d 287 (1976) (*Honaker I*), Judge Orth discussed for the Court a number

of our prior cases including *State v. Bennett Bldg. Co.,* 154 Md. 159, 140 A. 52 (1928). The Court said in *Honaker I*:

It is manifest on the face of § 62 of Art. 101, that in order to invoke its provisions there must be:
(1) a principal contractor
(2) who has contracted to perform work
(3) which is a part of his trade, business or occupation; and
(4) who has contracted with any other party as a subcontractor for the execution by or under the subcontractor of the whole or any part of such work. [*Id.* 278 Md. at 459-60.]

The Court quoted this in *Honaker II.* 285 Md. at 225. We pointed out in *Honaker I* and *Honaker II* that the term "principal contractor" is not synonomous with "general contractor." *Honaker I,* 278 Md. at 460 n.4, and *Honaker II,* 285 Md. at 225.

The parties are in agreement in this case that Derby meets criteria (1), (2), and (4). The dispute is whether the work for which Derby contracted is part of its "trade, business or occupation. . . ."

At trial Derby's evidence consisted solely of placing before the court certain drawings and the like. It presented no live testimony.

Because the evidence adduced by Coffey at trial differed from that which was before the Court in *Honaker II* on the motion for summary judgment, we shall first examine that which was before the Court then. On summary judgment the affidavit and deposition of Frederick B. Maples were considered. By the time of trial he had retired, but for the preceding thirty years he was employed by Derby, the last fifteen years of which (including the time of the incident) he was Derby's executive vice-president. His deposition and his affidavit indicated that the men who did the actual steel erection were employed by Prosser, the erection company. He said it was "usual practice to buy steel from the fabricator erected," although he claimed his men had the capability of

erecting it and said that he had subcontracted the erection here to Prosser. He did state in his affidavit, "[I]t is a common practice for steel fabricators in the Baltimore area to enter into contracts for both the supply and erection of steel. Such practice is customary in the industry, and contracting for both supply and erection of structural steel is an essential part of Derby's business." Coffey countered with an affidavit from the president of the general contractor, The Lacchi Construction Company. It was to the effect that Derby at the time of the incident was "engaged in steel fabrication," that it "held itself out as a steel fabricator; that as far as local steel fabricators are concerned, it is the experience of The Lacchi Construction Company that it is highly unusual for steel fabricators to erect steel with their own manpower but rather they subcontract the erection." The pages from the classified section of the Baltimore City telephone directory for the years 1971 to 1976, inclusive, reflecting that Derby advertised itself as a steel contractor and not as an erector, were also before the trial judge. The aforegoing is all that was before him. It supplied the basis for our saying, "The sum total of that which was before the trial judge on the motion for summary judgment is susceptible of an inference that Derby is no longer engaged in 'the trade, business or occupation' of steel erection." 285 Md. at 232.

With that reference we now turn to an examination of the evidence adduced by Coffey at this trial. It will be seen that not only was it in a different posture, but there was more to support Derby's position than when the matter was before the court on summary judgment.

The testimony of Mr. Maples is of critical importance here. He said that although at one time Derby had done erection work with its own employees, it no longer did so. It continued, however, to "bid structural steel furnished and erected." In response to a question as to "what the majority of . . . the work of Derby Steel was back in 1972" he replied, "We furnished and fabricated, delivered, and generally erected structural steel for the industry." He said that this "included entering into contracts to both furnish and erect the steel." In this instance Derby prepared drawings for

Prosser, the steel erector, to tell it where to put each piece. Maples indicated that in this transaction Derby made a profit on the work it subcontracted to Prosser. He said that Derby was responsible to the general contractor to see that the job progressed in accordance with Derby's subcontract from the general contractor. The testimony relative to the drawings and the profit made was not before the court on summary judgment. Moreover, the Maples testimony adduced by Coffey was more explicit as to Derby's bidding structural steel furnished and erected and generally erecting structural steel for the industry than on the motion for summary judgment.

Paul J. Prosser, Jr., of Prosser was another witness called by Coffey. He testified that at the relevant time Derby habitually entered into contracts with general contractors both to furnish and erect steel.

Franklin H. Smith, superintendent for Lacchi, the general contractor for the building, was yet another witness produced by Coffey. Although he said that he had never known of Derby's ever doing any erection by means of its own employees, he also said that at the time of the incident in question Derby was generally in the business of entering into contracts with general contractors and others both to fabricate and erect steel on jobs. He further testified, "It is general knowledge around that most fabricators when they write a contract, not all but most, at that time would take a contract with a general contractor, fabricate and erect it," letting a sub-contract for the actual erection.

By way of summary, the testimony of Maples was not precisely that which was before the trial court on the motion for summary judgment. Nothing from either Prosser or Smith was before the Court on summary judgment. It will be noted that their testimony served to reinforce the contention that erection of steel was a part of Derby's business although such was not done by Derby's erecting steel with its own employees. Also, a statement was extracted from Maples to the effect that Derby did not advertise in the classified section of the telephone book as a steel erector. Such is in no

way inconsistent with Derby's contention that its business includes the erecting of steel through subcontractors. No one has contradicted the testimony of Messrs. Maples, Prosser, and Smith. Thus, it was uncontradicted that the work in question was a part of Derby's "trade, business or occupation. . . ." A general contractor who bids a job and then subcontracts each of the various components of that job to others is in the business of being a general contractor for that type of construction notwithstanding the fact that no part of the actual work is performed by his own direct employees. It simply is not necessary that work be done by one's employees for one to be in a given business.

Coffey seems to be of the view that for one to be a "principal" contractor it is necessary for one to be a general contractor. That simply does not follow. That is like the argument we rejected in *Honaker II* that because Miller did not have employees who put roofs on houses that the placing of such a roof could not be part of its "trade, business or occupation" of building and selling homes. We said there was no question but that Miller was in the business of building and selling homes, that from time immemorial shelter from the elements has been regarded as one of the necessities of life, and that any structure with four walls must have a roof on it before it may be considered a house; thus a contention that the installation of a roof is not a part of the "trade, business or occupation" of building homes was without merit. 285 Md. at 229.

This case was before us in *Honaker II* on a motion for summary judgment with our then considering whether the pleadings, depositions, and admissions on file, together with the affidavits, if any, showed that there was no genuine dispute as to any material fact and that the moving party was entitled to a judgment as a matter of law. As we have pointed out, the function of a summary judgment proceeding is not to try the case nor to attempt to resolve factual issues, but to determine whether there is a dispute as to a material fact sufficient to provide an issue to be tried. *Dietz v. Moore,* 277 Md. 1, 4-5, 351 A.2d 428 (1976), and cases there cited. On the motion for summary judgment, all of the depositions,

pleadings, affidavits, admissions, and the like are considered together without reference to their origin and are examined to determine whether or not there is a *potential* triable issue of fact for submission to the jury.

The case has now been tried. At trial, more evidence was adduced in support of Derby's position which was not before the Court on the motion for summary judgment, as we have already pointed out. Moreover, the matter came before the Court in a somewhat different posture. Coffey was not bound in *Honaker II* by what he elicited from others by way of deposition nor was he bound by any affidavits submitted on behalf of his opponent. Coffey is bound by the testimony adduced by him at trial, which clearly establishes that the work here was a part of the "trade, business or occupation" of Derby, such testimony having been neither rebutted, contradicted, nor discredited. In *Proctor Electric,* 217 Md. 22 at 33, Judge Prescott referred for the Court to the fact that "[t]he testimony of a witness may be contradicted or discredited by circumstances as well as by statements of other witnesses, and a jury is not bound to accept a witness' testimony as true if it contains improbabilities, or if there are reasonable grounds for concluding that it is erroneous." This language was quoted with approval in *Williams,* 252 Md. at 80, and in *Wood v. Johnson,* 242 Md. 446, 453, 219 A.2d 231 (1966). None of these factual situations are present here. The situation before us in the present case would be different if the testimony in regard to Derby's business were produced *as a part of Derby's case.* There was, however, no evidence from Derby on that issue. When Coffey produced witnesses to testify in regard to Derby's business, we must view the collection of evidence in a different light inasmuch as it can go no further in Coffey's favor than that properly inferable from the evidence *Coffey produced.* In the present case, it is Coffey's evidence, not Derby's, which is before us in regard to Derby's business so that the only permissible factual finding under such evidence is that Derby is engaged, among other things, in the "trade, business or occupation" of steel erection. No evidence was produced which would justify an

inference to the contrary. Hence, the trial judge properly entered judgment n.o.v. in favor of Derby against Coffey.

### iv Schafer

The trial judge granted judgment n.o.v. as to Schafer on the grounds of contributory negligence. Schafer argues to us not only the issue of contributory negligence, but that Schafer owed no duty to Coffey and that there was no legally sufficient evidence of a breach of any duty that might have been owed by Schafer to Coffey. Under Rule 885 and our cases, these points having been argued to and considered by the trial court, we are permitted to base our decision on them rather than on the issue of contributory negligence. *See, e.g., Offutt v. Montgomery Co. Bd. of Ed.,* 285 Md. 557, 563-64, 404 A.2d 281 (1979); *Robeson v. State,* 285 Md. 498, 501-04, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021 (1980); *State v. Raithel,* 285 Md. 478, 482, 404 A.2d 264 (1979); *Mont. Co. v. Md. Soft Drink Ass'n,* 281 Md. 116, 122, 377 A.2d 486 (1977); *Panamerican Co. v. Broun,* 238 Md. 438, 447, 209 A.2d 575 (1965); and *Kent v. Mer.-Safe Dep. & Tr. Co.,* 225 Md. 590, 593, 171 A.2d 723 (1961).

The full allegation against Schafer was that it "was engaged and undertook to perform inspection and testing work which included the responsibility to inspect and test the design and manufacture of all steel beams used in said construction by structural iron workers such as . . . Coffey [ ] so that said steel beams would be free from defects and irregularities that made their use unsafe and unfit for incorporation into the building under construction"; that Coffey's "fall was caused by the carelessness, recklessness and negligence and wanton disregard of the rights of [Coffey] by . . . Schafer [ ] through its agents, servants and/or employees" in a number of regards including "intentionally, and with malicious disregard for the rights of [Coffey], permitting to be used a welded clip and seat type connection, as a temporary fastening device, in construction involving the use of struc-

tural steel, in violation of Article 63 [sic] [1], Section 54D of the ... Code of Maryland (1957)," and "[i]n negligently permitting to be attached said 'Saxe Clips' to the steel beams by 'tac welding', contrary to standards in the trade." It was alleged that Schafer failed "to exercise the customary and usual skill, knowledge and expertise of a reasonably competent testing laboratory, in connection with the inspection of steel beams supplied to construction site"; "to make known to [Coffey] hidden dangers, of which [Schafer] was aware or had reason to be aware, with regard to the design and manufacture of steel beams used by [Coffey]"; "to furnish, or cause to be furnished, steel beams" and "component parts of steel beams of suitable grade, size and quality, free from defects and irregularities, which made their use unsafe and unfit for incorporation into the building under construction"; and to "properly inspect the design and manufacture of steel beams, to insure that each beam was being designed and manufactured by such methods and with such materials, as to result in a safe beam, suitable for the use to which it was intended ...."

Schafer was invited by the architect to submit a proposal for "the inspection and testing of the shop fabricated and erected structural steel in accordance with AISC" (American Institute of Steel Construction). Accordingly, it submitted a proposal "[t]o furnish all necessary labor, equipment, services, and reports required to perform the shop and field inspection of the approximately 657 tons of structural steel," the services to "include performing all inspections in accordance with the approved specifications, the AISC Code of Standard Practice, and the latest applicable codes and specifications." This was accepted by the architect "on [its]

---

1. The intended reference apparently is to Code (1957, 1971 Repl. Vol., 1971 Cum. Supp.) Art. 43, § 54D enacted by Chapter 621 of the Acts 1971. Chapter 622 enacted § 54E on a somewhat similar subject. Section 2 of that act provided that its provisions "sh[ould] not be construed to apply to any activities in connection with any contracts made prior to September 1, 1971." The contract here in question was actually subsequent to September 1, 1971, although it apparently was the belief of some of the parties concerned with the Saxe Clips that because the plans and specifications were prepared prior to September 1, 1971, the statute was not applicable. We are not obliged to pass upon that question.

assumption" that two specified conditions would be met, namely:

1. The inspection of shop fabricated structural steel members will be in accordance with approved shop drawings and specifications, including checking for grade of steel, size of sections, lengths, dimensions and character of workmanship, checking connections, bolted or welded in accordance with AISC or AWS codes.

2. The field inspection of structural steel will include the examination of all sections checking for fit and alignment, plumb of columns, installation of high strength bolts as required and torquing of same to specification requirements. All field welded joints will be examined visually and gauged for size quality and adherence to AWS standards.

It will be noted that none of this specifed inspection for safety or the prescribing of any safety measures.

Lawrence Iacarino, who did the actual inspection for Schafer, was one of the witnesses called by Coffey. He said, "It's not the Saxe Clips that I was supposed to be doing. It was the procedures of the shop that I'm to inspect and see that they live up to."

George Evans, the structural engineer for the project, was another witness called by Coffey. He was asked whether it was contemplated that the inspections by Schafer "would be actually on the job or in the shop eight hours a day checking each item." He replied:

A No, sir. What we expected of the testing agency was that they would establish a level of quality of workmanship so that welders were qualified, that welders have a very definite procedure, which they go through to be qualified as a welder; and what they do, is they, an inspection agency maintains a quality of workmanship in the shop rather than inspecting every piece. In other

> words, what — if you don't have full-time inspection so that the inspector sees it as it comes off the production line it's impossible to inspect every piece, just physically impossible. And what we're after, and what we're buying in the allowance here is quality control. What we're after is — is the quality of workmanship in that shop, such that it can be an acceptable end product can be produced.

He indicated that this was "the usual and customary practice of th[o]se companies that make inspections to do what [he had] just testified to."

The accident in this case took place when an attempt was being made to connect a beam to a column. A "Saxe Clip" connector broke off, causing the beam to tilt and throwing Coffey to the ground. Coffey asserts, "The proximate cause of [his] fall was the fact that the Saxe Clip was tack-welded to the vertical column, contrary to the contractual obligations of . . . Derby . . . and established safety standards."

We had occasion in *Krieger v. J. E. Greiner Co.,* 282 Md. 50, 382 A.2d 1069 (1978), to examine the law relative to contracts of supervising engineers and their liability to an employee injured on the job. We pointed out:

> There is a decided split of authority as to whether an architect or engineer responsible for day to day supervision of a construction project is liable to a workman for unsafe working conditions or liable to others for yet other shortcomings of a contractor. . . . Although there is no clear majority view, it would appear that the weight of authority is on the side of nonliability. [*Id.* at 58-59 (citations omitted).]

We said for the engineer to be liable to an injured workman it was necessary to find a breach of a duty by the engineer to the workman and that such duty must arise either under a contractual provision placing that responsibility on the engineer or it had to be found that the engineer had assumed responsibility for safety. There is no contention in this case that Schafer has assumed any responsibility for safety.

Schafer's contract was one to guarantee a final work product, not one to assure safety. The sum total of the evidence adduced by Coffey in this case fails to show any breach of duty on the part of Schafer to Coffey or to anyone else. It follows, therefore, that the trial judge was correct in entering a judgment n.o.v. in favor of Schafer against Coffey et al.

> *Judgment affirmed; appellant to pay the costs.*