*Leroy C. Bell, Jr. and Bon Secours Hospital Baltimore, Inc. v. Patricia Chance,*
*Individually and as Personal Representative of the Estate of Brandon Mackey*
No. 36, September Term 2017


**Medical Malpractice – Mental Health Law – Involuntary Admission – Statutory**
**Immunity.** The Maryland Mental Health Law provides criteria for the involuntary
admission of an individual to a mental health facility and a process for assessing whether
the individual meets those criteria. The facility, as well as its agents and employees, have
immunity from civil or criminal liability when they follow that process in good faith. The
process begins with an application for involuntary admission made by an interested person,
accompanied by certifications of two health care providers that the individual meets the
statutory criteria, and ends with a hearing before an impartial hearing officer to determine
whether the criteria are in fact satisfied. The statutory immunity applies to a decision by a
psychiatrist at the facility in the interim – *i.e.*, between initial confinement pursuant to an
application and the hearing – that the individual must be released because he or she no
longer meets the statutory criteria for involuntary admission.

Circuit Court for Baltimore City
Case No. 24-C-13-001083
Argument: January 5, 2018

IN THE COURT OF APPEALS
OF MARYLAND

No. 36

September Term, 2017

_____

LEROY C. BELL, JR. AND BON SECOURS
HOSPITAL BALTIMORE, INC.

V.

PATRICIA CHANCE, INDIVIDUALLY AND AS
PERSONAL REPRESENTATIVE OF THE
ESTATE OF BRANDON MACKEY

_____

Barbera, C.J.,
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by McDonald, J.

_____

Filed: July 12, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

Civil commitment of an individual to a mental institution against the individual's will may be sought when it appears necessary for treatment of the individual's mental disorder and for the safety of that individual or others. However, a decision on involuntary admission must take account not only of health and safety concerns, but also of the individual's right to liberty under the State and federal constitutions. Accordingly, under the Maryland Mental Health Law, an individual may not be admitted involuntarily unless the individual: (1) has a mental disorder; (2) needs inpatient care or treatment; (3) presents a danger to the life or safety of self or others; (4) will not or cannot be admitted voluntarily; and (5) could not receive a less restrictive form of intervention consistent with the individual's welfare and safety.

An assessment of these criteria is made by a mental health facility when it considers whether to accept an individual presented for involuntary admission. A final decision as to whether the individual satisfies the criteria for involuntary admission is to be made within 10 days by an impartial hearing officer. Between the initial confinement of an individual and the ultimate review by the hearing officer, a physician caring for the individual at the facility must authorize release of the individual if the physician believes that the criteria for involuntary admission are no longer met. To encourage the appropriate exercise of that judgment, the Mental Health Law provides immunity from liability for a mental health facility, and its agents and employees, concerning decisions made in connection with the involuntary admission process.

Brandon Mackey, the 23-year-old son of Respondent Patricia Chance, attempted to commit suicide in April 2011. He was eventually taken to Petitioner Bon Secours Hospital

("Bon Secours") pursuant to an application for involuntary admission certified by two doctors at another hospital, and came under the care of Petitioner Dr. Leroy Bell, a psychiatrist then employed by Bon Secours. In accordance with the Mental Health Law, a hearing to determine whether Mr. Mackey should be admitted involuntarily or released was scheduled for 10 days later. In the interim, Mr. Mackey was confined at Bon Secours where Dr. Bell assessed and treated him. Two days before the scheduled hearing, Dr. Bell decided that Mr. Mackey did not meet the statutory criteria required for involuntary admission and authorized his release. Tragically, the day after Mr. Mackey was released, he committed suicide.

Litigation ensued in the Circuit Court for Baltimore City. Ms. Chance contended that Dr. Bell – and Bon Secours vicariously as his employer – were negligent in releasing her son. After a jury returned a verdict in Ms. Chance's favor, the Circuit Court vacated that judgment based in part on its understanding of the immunity statute. A divided Court of Special Appeals reversed the Circuit Court decision.

We hold that the process of involuntary admission begins with the initial application for involuntary admission of an individual and ends upon the hearing officer's decision whether to admit or release that individual. During that process, if a physician applies the statutory criteria for involuntary admission and concludes in good faith that the individual no longer meets those criteria, the facility must release the individual. That decision is immune from civil liability and cannot be the basis of a jury verdict for medical malpractice.

2

# I

## Background

### A.    *Involuntary Admission to a Mental Health Facility*

To place the issues in this case in context, we first outline the relevant statutory provisions governing involuntary admissions to mental health facilities and summarize a key decision of this Court construing the immunity from liability provided for those involved in that process.

*Admission to a Mental Health Facility under the Mental Health Law*

The Maryland Mental Health Law comprises Title 10 of the Health-General Article ("HG") of the Maryland Code.  HG §10-1101.  Subtitle 6 of the Mental Health Law concerns admission of an individual to a mental health facility for treatment and is divided into five parts.  The statute defines "admission" to a facility as "the process by which an individual is accepted as a resident in an inpatient facility[,]" which process "includes the physical act of the individual entering the facility."  HG §10-101(c)(1)-(2).  The statute defines a "facility" as "any public or private clinic, hospital, or other institution that provides or purports to provide treatment or other services for individuals who have mental disorders."  HG §10-101(g).  Admission may happen voluntarily – *i.e.*, with the patient's consent, or it may happen involuntarily – *i.e.*, without the patient's consent.

Particularly pertinent to this case are Part III of Subtitle 6 (HG §10-613 through §10-619), which concerns involuntary admission to a facility, and Part V (HG §10-631

3

through §10-633), which among other things concerns the hearing required for an involuntary admission.[1]

*Involuntary Admission – the Application and Certifications*

Any person with "a legitimate interest in the welfare of [another] individual" may apply for the involuntary admission of that individual to a facility. HG §10-614(a). The application must be made in writing, signed, and dated on a form required by the Behavioral Health Administration of the Department of Health, and state the relationship of the applicant to the individual for whom admission is sought. HG §10-615(1)-(5). Two certificates from health care providers must accompany that application.[2] HG §10-615(6). Those certificates must be based on each provider's personal examination of the individual and must include a diagnosis of a mental disorder, an opinion that the individual needs inpatient care or treatment, and "an opinion that admission to a facility … is needed for the protection of the individual or another." HG §10-616(a)(1)-(2). The Department of Health has provided in regulation that a certificate may not be used for an involuntary admission

---

[1] Part I (HG §10-601 through §10-607) contains general provisions relating to admission to a mental health facility. Part II (HG §10-608 through §10-612) concerns voluntary admissions. Part IV (HG §10-620 through §10-630) concerns emergency evaluations. Part V also requires a facility to notify an individual admitted to the facility and others of the individual's rights under the law.

[2] At the time of the events that gave rise to this case, the health care providers could be either two physicians or one physician and one psychologist. HG §10-615(6) (2011). The Legislature subsequently amended the statute to permit the certificates to also be provided by one physician and one psychiatric nurse practitioner. Chapter 330, Laws of Maryland 2015.

4

application if the examination on which it is based was done more than one week before the certificate was signed. COMAR 10.21.01.04B(4)(a), D(1)(a).[3]

A facility presented with such an application may not admit the individual involuntarily unless five criteria are met:

(1) the individual has a mental disorder;

(2) the individual needs inpatient care or treatment;

(3) the individual presents a danger to the life and safety of the individual or of others;

(4) the individual is unable or unwilling to be admitted voluntarily; and

(5) there is no available, less restrictive form of intervention that is consistent with the welfare and safety of the individual.

HG §10-617(a)(1)-(5).[4] Thus, in accepting such an individual as a patient, the facility must also assess whether the statutory criteria are met.

*Involuntary Admission – Hearing as Prerequisite for Admission*

The statute entitles "any individual proposed for involuntary admission" to "a hearing to determine whether the individual is to be admitted to a facility … as an

---

[3] The regulations provide additional detail as to the contents of a certificate.

[4] There is an additional criterion, not pertinent to this case, that must be met when the individual proposed for involuntary admission is 65 years old or older. The statute prohibits a facility from admitting anyone who is 65 years old or older "unless a geriatric evaluation team determines that there is no available, less restrictive form of care or treatment that is adequate for the needs of the individual." HG §10-617(b)(1).

5

involuntary patient or released without being admitted." HG §10-632(a). The hearing is to be conducted within 10 days of the patient's "initial confinement" in the facility before an impartial hearing officer designated by the Secretary of Health. HG §10-632(b), (d). The Secretary of Health has designated the administrative law judges ("ALJs") of the Office of Administrative Hearings to serve as the impartial hearing officers contemplated by the statute. COMAR 10.21.01.02B(2).

After considering all the evidence and testimony of record, the hearing officer is to order the release of the individual from the facility unless there is clear and convincing evidence of each of the five criteria required for involuntary admission. HG §10-632(e)(2)(i)-(v). Pursuant to a statutory directive, the Department of Health has adopted procedural regulations for such hearings. HG §10-632(d)(1); COMAR 10.21.01.09. The hearing officer's decision is subject to judicial review under the State Administrative Procedure Act. HG §10-633.

*Involuntary Admissions – Regulations Governing the Process*

The regulations adopted by the Department of Health for involuntary admission provide additional detail concerning the process of admission. COMAR 10.21.01. Those regulations refer to the individual as being in "observation status" during the time the individual is confined in a facility involuntarily on the basis of an application before "the individual is either admitted, voluntarily or involuntarily, to the inpatient facility or is released by a physician or by an ALJ from the inpatient facility without being admitted."

6

COMAR 10.21.01.02B(18).[5]  The regulations provide that an individual confined in a facility on observation status remains in that status unless (1) admitted voluntarily to the facility; (2) released upon a finding by a physician that the individual no longer meets the criteria for involuntary admission; or (3) either admitted to or released from the facility as a result of the hearing before the ALJ.  COMAR 10.21.01.07F.  The regulations thus contemplate that an individual confined in a facility as a result of an application for involuntary admission is considered admitted to the facility only if the individual consents (*i.e.,* the  admission becomes voluntary) or if involuntary admission is authorized by an ALJ.[6]

---

[5] The regulations provide that an individual who is confined on observation status is to receive notice of the right to a hearing before an ALJ, among other rights.  COMAR 10.21.01.05, 10.21.01.06.

[6] Even if an ALJ finds that the statutory criteria are satisfied and authorizes an involuntary admission, the Mental Health Law provides other mechanisms for the release of the individual who has been admitted involuntarily.  The individual, or the Director of the Behavioral Health Administration may apply for a writ of habeas corpus.  HG §10-804.  In addition, the individual, or any person who has a legitimate interest in the patient's welfare, may petition a court for release.  HG §10-805(a)(1)-(2).  If a trier of fact finds that the patient has a mental disorder and also needs inpatient care or treatment, the petition is to be denied.  HG §§10-805(f) and 10-805(g)(1).  But if the trier of fact finds one or both of those elements absent, the patient is to be released.  HG §10-805(g)(2).

A "responsible official" – defined as the director or administrative head of the facility (HG §10-806(a)(2)) – may also initiate a patient's release.  That official may direct the release of the patient if he or she finds that the patient does not have a mental disorder.  The official must also direct the patient's release if the patient has a mental disorder, but does not need inpatient medical care or treatment for the protection of the patient or another, would not endanger self or another person or property, and the patient or another responsible person is willing and able to provide any necessary care.  HG §10-806(b).
(Continued)

7

*Involuntary Admission – Statutory Immunity*

The Mental Health Law provides immunity from liability for those involved in the decision whether to admit an individual to a mental health facility against his or her will. HG §10-618; Maryland Code, Courts & Judicial Proceedings Article ("CJ"), §5-623. In particular, an applicant who acts "in good faith and with reasonable grounds" is immune from civil or criminal liability relating to the application. HG §10-618(a); CJ §5-623(b). Similarly, a mental health facility, as well as an agent or employee of a facility, that, in good faith and with reasonable grounds, acts in compliance with the provisions of Part III of Subtitle 6 is not civilly or criminally liable for those actions. HG §10-618(b)-(c); CJ §6-623(c)-(d).

*The Williams Case:  Statutory Immunity Applies to Decision Not to Admit*

This Court construed the scope of the immunity granted in HG §10-618 and CJ §5-623 in *Williams v. Peninsula Regional Medical Center*, 440 Md. 573 (2014). In that case, a mother brought her son to the hospital because the son had been suffering from suicidal thoughts and hallucinations. 440 Md. at 575-76. After evaluating the son, the mental health care providers at the hospital decided to release him without admitting him to the hospital and directed him to "return if he felt that he would harm himself or others." *Id.*

---

(Continued)

A facility may not hold a patient more than a year after an involuntary admission on the basis of the initial involuntary admission decision. HG §10-806(d)(1)-(3). Before the year expires, the facility must either admit that patient voluntarily, HG §10-609, begin the involuntary admission process anew, HG §10-616, or discharge the patient. HG §10-806(d).

8

That same night, the son spent several hours wandering the streets, broke into a residence, and stood in the front yard wielding a knife. *Id.* When the police arrived, the son rushed the officers, who then shot and killed him. *Id.*

The family sued the mental health care providers, asserting they were liable for their "failure to admit" the son which, the family alleged, proximately caused his death. The circuit court dismissed the complaint on the basis of statutory immunity – a decision affirmed by the Court of Special Appeals. 213 Md. App. 644 (2013).

In this Court, the family argued that the statutory immunity provided by Mental Health Law applies only when a facility decides to admit an individual and not when it decides against admitting the individual. The Court reviewed the structure of Part III of Subtitle 6 and its legislative history. The Court noted that its purpose was to discourage excessive institutionalization and to protect the due process rights of individuals who are proposed for involuntary admission. *Id.* at 586. "That the General Assembly mandated a multi-step process before an individual's involuntary admission … suggests a legislative concern that individuals may be wrongfully admitted." *Id*. at 584. If a health care provider has immunity only when the provider admits an individual, the immunity provision would undermine the purpose of the statute, creating "an incentive to err on the side of involuntary admittance in order to receive statutory immunity and avoid liability." *Id.* at 587. The Court reasoned that applying the immunity provisions to the provider's decision on admission – regardless of whether that decision is to admit or to release the individual – ensures that no one will be held against his or her will out of a physician's fear of a lawsuit.

9

*Id.* at 587. Accordingly, the Court held that the statutory immunity extended to the good faith decision to release the son.

**B.      Facts**

While the parties differ on whether Dr. Bell was negligent or has immunity, the basic chronology of events appears to be undisputed.

*The Attempted Suicide of Brandon Mackey*

On March 13, 2011, after struggling for years with chronic mental illness, 23-year-old Brandon Mackey cut his wrists with a knife in an apparent attempt to commit suicide. At the time, Mr. Mackey lived at home with his mother and her husband, who witnessed the incident and called the police. An ambulance arrived and transported Mr. Mackey to Harbor Hospital.

*Mr. Mackey's First Stay at Bon Secours – Voluntary Admission*

Harbor Hospital referred Mr. Mackey to Bon Secours, where he was voluntarily admitted for psychiatric treatment the next day, March 14, 2011. Once at Bon Secours, Mr. Mackey came under the care of Dr. Bell, an attending psychiatrist at the hospital.

Dr. Bell evaluated Mr. Mackey and gathered that Mr. Mackey was depressed. He prescribed an antidepressant, an antipsychotic (as the need might arise), and other medications for Mr. Mackey. Mr. Mackey remained at Bon Secours from March 14 until March 21, 2011, under Dr. Bell's care. At the time of Mr. Mackey's discharge, Dr. Bell diagnosed him as having "major depressive disorder." According to Dr. Bell, at that time he did not see symptoms of schizophrenia in Mr. Mackey, and the "psychotic behavior"

10

that was apparent at the beginning of Mr. Mackey's time at Bon Secours "appeared to withdraw" by the time of his discharge. Dr. Bell also felt that the level of Mr. Mackey's depression had decreased over the course of his treatment at Bon Secours. In Dr. Bell's view, Mr. Mackey became more active, interacted more with others, and no longer communicated any suicidal thoughts. Dr. Bell decided to discharge Mr. Mackey on March 21, 2011, and move him to an aftercare program – a lower level of care that included partial hospitalization.[7]

*Mr. Mackey's Second Stay at Bon Secours – Involuntary Admission*

Less than two weeks later, on April 1, 2011, Mr. Mackey was again taken to an emergency room. This time, Ms. Chance brought Mr. Mackey to St. Agnes Hospital after Mr. Mackey sustained a wound to his neck. Mr. Mackey claimed that the cut had happened by accident when he fell on the stairs while holding a pair of scissors. However, the emergency room doctor believed that Mr. Mackey had intentionally cut his neck in a suicide attempt. A psychiatric evaluation of Mr. Mackey was performed, and a social worker completed an application for Mr. Mackey's involuntary admission to Bon Secours. Two clinicians at St. Agnes Hospital provided the required certificates that accompanied the application for involuntary admission of Mr. Mackey to Bon Secours. A hearing was scheduled for April 11, 2011 – 10 days after Mr. Mackey's initial confinement, and he was transferred to Bon Secours.

---

[7] As Dr. Bell would later learn, Mr. Mackey did not attend the aftercare program.

11

Dr. Bell once again began to treat Mr. Mackey. Dr. Bell examined Mr. Mackey, and agreed with the emergency room doctor at St. Agnes that Mr. Mackey had attempted to commit suicide. On this occasion, Dr. Bell diagnosed Mr. Mackey with schizoaffective disorder – a hybrid of a mood disorder (in Mr. Mackey's case, depression) and schizophrenia. Notes made by the treatment team at that time indicated that Mr. Mackey was "suspicious," that he had a "flat or constricted affect," and that he was "holding his head … and … pacing back and forth," and "responding to internal stimuli" – *i.e.*, "hearing voices." As Dr. Bell treated Mr. Mackey, he tried to determine whether those symptoms were evidence of psychotic behavior or obsessional behavior. Six days into Mr. Mackey's second stay at Bon Secours, on April 6, 2011, Dr. Bell prescribed for Mr. Mackey the drug Risperdal, an antipsychotic medication that, as Dr. Bell understood it, could also potentially reduce any obsessional behavior.

According to Dr. Bell, he saw improvement in Mr. Mackey's symptoms over time. While Mr. Mackey had started his stay at Bon Secours denying that he had attempted to commit suicide, by April 6, 2011, he had admitted to Dr. Bell that the wound on his neck was the result of a suicide attempt.[8] Additionally, Mr. Mackey was denying suicidal

---

[8] In his trial testimony, Dr. Bell acknowledged that Mr. Mackey continued to deny the suicide attempt to the rest of the treatment team. Nevertheless, Dr. Bell saw Mr. Mackey's willingness to admit a suicide attempt, even if only to Dr. Bell, as a sign of improvement.

thoughts, paranoia, and suspiciousness. According to Dr. Bell, Mr. Mackey was compliant with his medication, was future oriented, and made no efforts to harm himself.

Throughout his stay Mr. Mackey maintained that he wanted to leave Bon Secours and return home. In light of the improvements in Mr. Mackey's condition, Dr. Bell felt that he "was stable enough to go to a lower level of care and was not a danger to himself or others" – which meant that two of the criteria required for involuntary admission no longer applied. As a result, Dr. Bell authorized the release of Mr. Mackey on April 9, 2011. On the day of Mr. Mackey's discharge, Dr. Bell referred him to an aftercare program, which was to begin on April 12, 2011. Mr. Mackey left Bon Secours with Ms. Chance and returned home.

*Mr. Mackey's Suicide*

The next day, on the morning of April 10, 2011, Mr. Mackey left his home after his mother went to church. He went to a subway station, jumped in front of an oncoming train, and was killed.

## C. *Legal Proceedings*

*The Complaint*

Almost two years after her son's death, on February 25, 2013, Ms. Chance commenced this wrongful death and survivorship action against Dr. Bell and Bon Secours[9]

---

[9] Ms. Chance initially named as defendants three entities that include "Bon Secours" as part of their names. The complaint was dismissed by stipulation in June 2013 as to two of those entities, leaving Bon Secours Hospital Baltimore, Inc. as the sole corporate defendant.

in the Circuit Court for Baltimore City. Acting individually and as personal representative of Mr. Mackey's estate, Ms. Chance sued Dr. Bell and Bon Secours for medical malpractice. In her complaint, Ms. Chance claimed, among other things, that Dr. Bell – and through vicarious liability, Bon Secours as his employer[10] – breached the accepted standard of care in the treatment of Mr. Mackey by prematurely releasing Mr. Mackey from Bon Secours.[11] Had Dr. Bell acted otherwise, Ms. Chance alleged, Mr. Mackey would not have committed suicide.

*Motion for Summary Judgment Based on Immunity Statutes*

On December 16, 2013, Dr. Bell filed a motion for summary judgment arguing that he was entitled to statutory immunity under HG §10-618(c) and CJ §5-623(d) for his decision to release Mr. Mackey from Bon Secours. Shortly thereafter, Bon Secours filed a similar motion. Both motions cited the recently-issued decision of the Court of Special Appeals in *Williams* in support of this proposition.[12] The motions argued that the decision

---

[10] At trial, the Circuit Court granted Bon Secours' unopposed motion for judgment on any claim against it other than a claim based on vicarious liability as the employer of Dr. Bell.

[11] Ms. Chance also claimed that Dr. Bell breached the standard of care by failing to obtain a medical history for Mr. Mackey, failing to speak with Mr. Mackey's family about his condition, failing to properly diagnose Mr. Mackey, and failing to implement an appropriate course of treatment – all of which, in Ms. Chance's view, factored into Dr. Bell's decision to release Mr. Mackey prematurely.

[12] The *Williams* case had not yet made its way to this Court. *See* 213 Md. App. 644 (2013), *aff'd*, 440 Md. 573 (2014).

to release Mr. Mackey was essentially a decision "not to admit" Mr. Mackey, and under the recent Court of Special Appeals decision in *Williams*, a decision not to admit is covered by the immunity granted in HG §10-618 and CJ §5-623.

On February 24, 2014, the Circuit Court denied the motions for summary judgment, ruling that "admission" under the Mental Health Law is "limited to the initial decision concerning admission and not to decisions that are made while a patient remains admitted in the facility." Accordingly, the Circuit Court ruled, Dr. Bell and Bon Secours were not entitled to immunity for Dr. Bell's decision to release Mr. Mackey after Bon Secours initially accepted him when he first entered the hospital. The implicit premise of the Circuit Court decision was that the decision on involuntary admission of Mr. Mackey was complete when he was first confined at Bon Secours on April 1, 2011, and his subsequent release was not part of that decision. Both the motions for summary judgment and the Circuit Court decision referred only to the statutory provisions concerning immunity and the initial application. Neither made any reference to HG §10-632 concerning the required hearing or to the regulations governing the process for involuntary admission.

*Plaintiff's Motion in Limine to Preclude Evidence Concerning Immunity*

After the Circuit Court denied the motion for summary judgment, Ms. Chance filed a motion *in limine* on April 4, 2014, to preclude Dr. Bell and Bon Secours from presenting any evidence or argument to the jury relating to immunity under HG §10-618 and CJ §5-623. Ms. Chance contended that the potential application of those statutes was a purely legal question, inappropriate to present to a jury, and that the legal issue had already been

15

decided by the Circuit Court in its ruling on summary judgment. Dr. Bell and Bon Secours did not file oppositions to the motion *in limine*.

At a motions hearing held shortly before trial, the trial judge – who was not the same judge who had ruled on the summary judgment motion – asked counsel for Dr. Bell and Bon Secours whether they "concede that there is no issue with the statutory immunity for health care providers who admit patients[.]" Defense counsel responded that it was not an issue that would be presented to the jury. The Court then granted the motion *in limine*, indicating that it agreed with the earlier decision on summary judgment that the immunity under the statute "occurs at the point of admission and possibly continued admission," but is inapplicable to a decision to discharge after admission.

*The Trial*

The case was tried before a jury during June 23-26, 2014. At the trial, the medical records concerning Mr. Mackey's various hospitalizations were introduced in evidence by stipulation. Plaintiff's counsel called Ms. Chance and Dr. Bell to the stand to describe the events surrounding Mr. Mackey's two stays at Bon Secours, his release on April 9, 2011, and the aftermath. The defense examined Dr. Bell extensively as well, and called a registered nurse from Bon Secours who worked with Dr. Bell and who cared for Mr. Mackey during both of his stays at the hospital. She testified as to the improvement in Mr. Mackey's condition during his second stay at Bon Secours.

The heart of the case was a battle of two highly-credentialed expert psychiatrists concerning the merits of the decision to release Mr. Mackey. Dr. Nicola Cascella was

called to testify as an expert witness for the plaintiff on whether Dr. Bell had complied with the standard of care. In his testimony, Dr. Cascella criticized Dr. Bell for not consulting more with Mr. Mackey's family and not obtaining additional records of Mr. Mackey's prior hospitalizations. He also opined that Dr. Bell had failed to diagnose Mr. Mackey correctly and implement an appropriate course of treatment. Ultimately, Dr. Cascella testified that Dr. Bell's decision to discharge Mr. Mackey on April 9, 2011 was a breach of the applicable standard of care. Dr. Cascella testified that, in his opinion, Mr. Mackey continued to meet all five criteria required for involuntary admission at the time of his release from Bon Secours. Dr. Cascella concluded that Dr. Bell's decision to release Mr. Mackey "more likely than not" caused Mr. Mackey's suicide.

In its case, the defense called Dr. John Lion, who opined that Dr. Bell's decision to release Mr. Mackey on April 9, 2011, complied with the applicable standard of care. We need not chronicle the details of Dr. Lion's testimony for purposes of this opinion, as we will assume that the jury accepted Dr. Cascella's opinion as to one or more of the points in dispute. *See* Part II.B. of this opinion concerning the standard of review.

At the close of the plaintiff's case, Dr. Bell and Bon Secours moved for judgment. They argued, among other things, that no reasonable juror could find, on the basis of Dr. Cascella's testimony, that there was a breach of the standard of care or causation of Mr. Mackey's suicide. The trial court denied the motion with the observation that it was "very difficult [to determine] whether Dr. Cascella's opinion [was] sufficient, both on the standard of care and breach of the standard of care…" At the close of all of the evidence,

17

Dr. Bell and Bon Secours renewed their motion for judgment. The Circuit Court again characterized the plaintiff's "best evidence" on the standard of care and causation – Dr. Cascella's testimony – as "very marginal," but elected to reserve its ruling on the motion, pursuant to Maryland Rule 2-519(c), and send the case to the jury.

On June 26, 2014, the jury returned a verdict in Ms. Chance's favor. It awarded $6,112 for funeral expenses and noneconomic damages of $2.3 million.[13]

*Post-Trial Motion for Judgment Notwithstanding the Verdict*

Dr. Bell and Bon Secours filed a post-trial motion for judgment notwithstanding the verdict ("judgment NOV") or alternatively for a new trial. On November 6, 2014, the Circuit Court heard argument on that motion.

In a memorandum opinion dated December 11, 2014, the Circuit Court granted the motion for judgment NOV and vacated the judgment in favor of Ms. Chance. The Circuit Court explained that Dr. Cascella's testimony failed to establish that Dr. Bell or Bon Secours had breached the applicable standard of care. Although the court recognized that neither Dr. Bell nor Bon Secours had relied on statutory immunity in their motion for judgment NOV,[14] the court reasoned that the statutory process for involuntary admission

---

[13] The total award was later reduced to $701,112 based on the statutory limit on noneconomic damages. *See* CJ §3-2A-09.

[14] Dr. Bell apparently filed a supplemental memorandum relying on the Court of Appeals decision in *Williams* shortly after this Court issued that decision in November 2014, but that memorandum apparently crossed in the mail with the Circuit Court's decision on the motion for judgment NOV.

immunity and the recently-issued *Williams* decision were relevant to the question before it.[15] The Circuit Court held that the Mental Health Law requires a physician, when deciding whether to "continue admission" of a patient, to "consider the patient's countervailing liberty interest and to discharge the patient as soon as the [physician] believes, in his or her best judgment, the patient safely can be treated and maintained in a less restrictive setting." The Circuit Court ruled that Dr. Cascella's opinion that Dr. Bell "*could* have found the statutory criteria to be satisfied and therefore *could* have held Mr. Mackey until the ALJ hearing on the following Monday, both failed to give weight to Mr. Mackey's liberty interest and failed to answer the negligence question." (emphasis in original). Determining that the "criteria for involuntary admission are necessarily subject to a broad range of judgment," and "that is why the General Assembly has afforded immunity from civil liability when that discretion is exercised in good faith," the Circuit Court found that Dr. Cascella failed to answer the question "whether no reasonable physician exercising reasonable care in [those] circumstances would have discharged Mr. Mackey."

---

[15] Analyzing Dr. Cascella's testimony in some detail, the Circuit Court also observed that his criticisms of Dr. Bell in regard to contacting family members and obtaining records failed to provide the jury with a clear standard of care or any indication that those alleged failings caused Mr. Mackey's suicide. The court also noted that Dr. Cascella's critique of Dr. Bell's diagnosis related to the *initial* diagnosis on Mr. Mackey's first visit to Bon Secours and failed to connect that critique to Dr. Bell's care of Mr. Mackey on his second visit.

*Appeal to Court of Special Appeals*

Ms. Chance appealed the Circuit Court's decision to the Court of Special Appeals. In an unreported 2-1 decision, the Court of Special Appeals reversed the Circuit Court. *Chance v. Bon Secours Hosp.*, 2017 WL 1716258, at *6 (May 2, 2017). The opinion of the panel majority stated that the dispositive question on appeal was whether there was evidence from which the jury could have concluded that Dr. Bell's decision to discharge Mr. Mackey on April 9, 2011, was a breach of the applicable standard of care. It concluded that Dr. Cascella's testimony was sufficient to support the jury verdict. *Id.* at *4. Specifically, the jury could have found from Dr. Cascella's testimony that: "(1) the standard of care required Dr. Bell not to discharge [Mr. Mackey] until his symptoms of psychosis were significantly reduced by Risperdal, (2) that, at the time Dr. Bell discharged [Mr. Mackey], the patient continued to present symptoms of responding to internal stimuli, as well as poor insight and poor judgment, indicating that [Mr. Mackey's] symptoms had not yet been significantly reduced by Risperdal, and (3) that [Mr. Mackey's] premature discharge from Bon Secours was a proximate cause of his death." *Id.* at *5. The panel majority did not address the effect of the immunity statutes or the *Williams* decision.

Judge Friedman dissented from the panel decision. In Judge Friedman's view, Dr. Bell's decision to release Mr. Mackey "could not, *as a matter of law*, constitute a violation of the standard of care." *Id.* at *6 (emphasis in original). Judge Friedman opined that Dr. Cascella's proposed standard of care would mean that "any physician who decided not to commit his patient under these circumstances would be open to civil liability." *Id.* at *6.

20

This, Judge Friedman argued, would conflict with HG §10-618, which, as explained in the *Williams* decision, protects facilities and their physicians from liability for a good-faith decision not to admit an individual involuntarily. *Id.*

We granted a petition for writ of *certiorari* filed by Dr. Bell and Bon Secours.

## II

### Discussion

The petition for a writ of *certiorari* in this case raised the question whether a psychiatrist's decision to release a patient who has been confined pursuant to an application for involuntary admission is covered by the immunity from civil and criminal liability provided in HG §10-618 and CJ §5-623.

*A.    Preservation*

Ms. Chance argues that Dr. Bell and Bon Secours failed to preserve any argument concerning immunity in the trial court. "Ordinarily, the appellate court will not decide any … issue [other than jurisdiction] unless it plainly appears by the record to have been raised in or decided by the trial court…" Maryland Rule 8-131(a).

It is true that Dr. Bell and Bon Secours did not rely on statutory immunity in their motion for judgment NOV. But they did raise the question of statutory immunity in their motions for summary judgment. The Circuit Court rejected that argument as a matter of law. A different judge of the Circuit Court, who presided over the trial, confirmed that

21

ruling at the outset of the trial.[16] That interlocutory ruling on immunity is open to review on appeal. Maryland Rule 8-131(d); *Melbourne v. Griffith*, 263 Md. 486 (1971). In addition, in awarding judgment NOV in favor of Dr. Bell and Bon Secours, the Circuit Court relied in part on statutory immunity and this Court's then-recent decision in *Williams* construing those statutes. Thus, the issue of statutory immunity was both raised in the trial court, once by the trial court itself, and addressed by the trial court in two rulings, one of which was the basis for Ms. Chance's own appeal to the Court of Special Appeals.

## B.  *Standard of Review*

We review a trial court's grant of a motion for judgment NOV for legal correctness. *Sage Title, LLC v. Roman*, 455 Md. 188, 201 (2017). In considering a motion for judgment NOV, the evidence and inferences to be drawn from the evidence must be considered in the light most favorable to the party opposing the motion. *Lusby v. First National* Bank, 263 Md. 492, 499 (1971). However, if there is no rational ground under the law governing the case for upholding the jury's verdict, judgment NOV must be granted. *Id.* at 506. When the primary issue is, as here, one of statutory interpretation and application, we review it without deference to the trial court. *Garfink v. Cloisters at Charles, Inc.*, 392 Md. 374,

---

[16] Ms. Chance argues that Dr. Bell and Bon Secours abandoned the issue of statutory immunity when they did not oppose her pretrial motion *in limine* to bar evidence and argument related to immunity. However, in that motion, Ms. Chance argued that immunity was a legal question that was not before the fact finder – *i.e.*, the jury. In response to an inquiry from the trial court, defense counsel accepted that proposition – which had been the basis of the Circuit Court's earlier ruling on summary judgment. While the defense could have attempted to relitigate the summary judgment motion at that point, it was not required to do so to preserve the issue.

383 (2006).  Similarly, when a Circuit Court's denial of summary judgment turns on its interpretation of a statute – as opposed to a determination that facts are in dispute – that ruling rests on a question of law.  We review the resolution of that legal question without deference to the trial court.

## C.     *The Extent of Statutory Immunity for a Physician's Decision to Release an Individual Confined in a Mental Health Facility*

The question posed in the petition for a writ of *certiorari* in this case is whether the immunity provided by HG §10-618 and CJ §5-623 extends to a psychiatrist's decision to release an individual like Mr. Mackey after the individual's initial confinement in a mental health facility.  Under those statutes, a facility, like Bon Secours, and an agent or employee of that facility, like Dr. Bell, have immunity from civil or criminal liability, if "in good faith and with reasonable grounds" they act "in compliance with the provisions of Part III."

This raises two interpretative questions:

(1) What does it mean to act "in compliance with Part III"?

(2) What does it mean to act "in good faith and with reasonable grounds"?

The answers to these two questions are matters of statutory construction.  When we construe a statute, we search for legislative intent.  *Hughes v. Moyer*, 452 Md. 77, 94 (2017).  Consideration of the statutory text in context is our primary guide.  We may refer to the statute's legislative history to "confirm conclusions or resolve questions" from our examination of the text.  *Blue v. Prince George's County*, 434 Md. 681, 689 (2013).  Finally, we check our interpretation against the consequences of alternative readings of the text.  *Id.*  Throughout this process, we avoid constructions that are illogical or nonsensical,

23

or that render a statute meaningless. *Fisher v. Eastern Correctional Inst.*, 425 Md. 699, 706 (2012); *Frost v. State*, 336 Md. 125, 137 (1994).

> 1. Acting in Compliance with Part III

*Text in Context*

As outlined earlier in this opinion, Part III of Subtitle 6 of the Mental Health Law concerns involuntary admission to a facility like Bon Secours and the decisions to be made by that facility through its agents and employees in the involuntary admission process. What does it mean to be admitted involuntarily to a mental health facility?

It may be said that an individual who enters the facility, is accepted for residence there, and begins to receive care has been "admitted" to the facility. But that is not the end of the involuntary admission process contemplated by Part III. As indicated earlier, it is evident from related provisions of the Mental Health Law that "admission" under statute extends beyond physical entry and initial acceptance into a facility. That law defines "admission" as a "process" that "includes the physical act" of entry into the facility. *See* HG §10-101(c). In the Maryland Code, the term "includes" means "includes but not limited to." Maryland Code, General Provisions Article ("GP") §1-110.[17] Thus, while the physical act of entering a facility is a part of admission, it does not exhaust the process of involuntary admission of an individual.

---

[17] The definition states that the term "includes" means "includes or including by way of illustration and not by way of limitation." GP §1-110.

As another related provision makes clear, the involuntary admission process under Part III is not complete until a hearing is conducted to determine whether the criteria for involuntary admission are satisfied. Under HG §10-632,[18] an individual proposed for involuntary admission has a right to a hearing within 10 days. The purpose of this hearing, referred to in the statute as the "hearing on the admission," is "to determine whether the individual is to be admitted to a facility … as an involuntary patient or released without being admitted." HG §10-632(a), (f)(1). At the hearing, the ALJ determines whether the five criteria required for involuntary admission exist at the time of the hearing. If they do not, the ALJ "order[s] the release of the individual from the facility … whose involuntary admission is sought." HG §10-632(e)(2).

Plainly, the statute does not consider an individual "admitted" as of the time the individual appears before the ALJ for the hearing. Rather, the confined individual is "*proposed* for involuntary admission"; involuntary admission is "sought" as opposed to already achieved; and the hearing will determine whether that individual is "to be admitted to a facility or released without being admitted." Moreover, the ALJ is to release the individual unless those five criteria are satisfied *at the time of the hearing*. HG §10-632(e)(2).

_____

[18] While this provision appears in Part V of Subtitle 6, it specifically concerns the process for involuntary admission under Part III.

*Related Regulations and Legislative History*

The regulations adopted by the Department of Health governing involuntary admission are certainly consistent with this interpretation. Those regulations define an involuntary admission as when "an individual has been admitted to an inpatient facility by an ALJ following an [involuntary admission hearing] pursuant to [HG] §10-632." COMAR 10.21.01.02B(12). They refer to a patient who has been confined but not afforded a hearing as under "observation status," rather than involuntarily admitted. COMAR 10.21.01.02B(18). Moreover, the regulations require that a physician who examines an individual on observation status "immediately release the individual" if the patient does not meet the criteria required for involuntary admission under HG §10-617. COMAR 10.21.01.07.

Ordinarily, we would say that the views of the Department, as the agency administering the statute, are entitled to "considerable weight." *Adventist Health Care Inc. v. Maryland Health Care Com'n*, 392 Md. 103, 121 (2006). In this instance, the Department's view is even more persuasive, as the legislative history of HG §10-632 reveals that the General Assembly intended to approve and codify the Department's regulations – which pre-existed the statute – when it enacted HG §10-632.[19]

---

[19] An excellent detailed examination of the history of those regulations and the statute as a response to contemporary court decisions may be found in *J.H. v. Prince George's Hospital Center*, 233 Md. App. 549, 570-81 (2017).

26

During the 1960s and 1970s, a series of court decisions – including several by the Supreme Court[20] – emphasized the constitutionally protected right to liberty of individuals who are civilly committed to mental health institutions.  In response, the Department of Health and Mental Hygiene – as the Department of Health was then called[21] – adopted regulations providing for a hearing before an impartial hearing officer as part of the involuntary admission process.  Those regulations, which set forth an involuntary admissions process similar to the current process, were ultimately codified, as subsequently amended, in COMAR 10.21.01.

HG §10-632 was first enacted in 1982 – the same year as the law providing immunity to facilities and their agents and employees with respect to the involuntary admissions process.  Chapter 525, §§2, 3, Laws of Maryland 1982 (enacting involuntary admission hearing statute); *see also* Chapter 459, Laws of Maryland 1982 (extending immunity related to involuntary admission decisions to facilities and their agents and employees).  Various materials in the legislative file indicate that the bill that enacted HG §10-632 was intended to codify the Department's regulations governing the involuntary admission process.  *See, e.g.,* Fiscal Note for Senate Bill 437 (1982) (bill "codifies existing practice"); Letter of Dr. Ari Karahasan, Director of Mental Hygiene Administration, to

---

[20] *See, e.g.*, *O'Connor v. Donaldson*, 422 U.S. 563 (1975); *Humphrey v. Cody*, 405 U.S. 504, 509 (1972); *McNeil v. Director, Patuxent Institution*, 407 U.S. 245 (1972); *Specht v. Patterson*, 386 U.S. 605 (1967).

[21] Effective July 1, 2017, the Department of Health and Mental Hygiene was renamed as the Department of Health.  Chapter 214, Laws of Maryland 2017.

Senator Melvin Steinberg, Chairman of Senate Finance Committee (February 11, 1982) (bill intended to "prevent the admission of patients who should not be deprived of their civil liberties"); Memorandum of George M. Lipman, Chief Assistant Public Defender, Mental Health Division, to Senate Finance Committee concerning Senate Bill 437 (1982) (attaching COMAR 10.21.01 and stating that provisions of the bill "represent a codification" of those regulations).

*Consequences*

To construe involuntary admission under Part III narrowly to encompass only the initial decision on an application for involuntary admission and not the period during which the individual is considered to be on "observation status" would conflict with the purpose of the immunity provision. As this Court pointed out in *Williams*, the purpose of the statutory immunity is to eliminate the incentive that a mental health facility or its physicians might otherwise have to err on the side of curtailing an individual's liberty in order to protect themselves from liability. A narrow construction of the immunity statute would discourage a facility that made an initial decision that an individual be involuntarily admitted based on the statutory criteria from releasing that individual if, even a day later, it determined that those criteria were no longer met.

It is thus evident that involuntary admission to a mental health facility is a process that includes at least an application accompanied by two certifications, the physical act of the individual entering the facility, and a hearing before an ALJ, after which the individual is either admitted or released without being admitted. Throughout that process, Part III of

28

Subtitle 6 requires that the facility and the psychiatrist treating the patient ensure that the individual is confined against his or her will only if the criteria set forth in HG §10-617 remain satisfied. If they are not satisfied, the facility and the psychiatrist are obligated by Part III to release the individual. HG §10-617(a).

Ms. Chance contends that this view of admission to a mental health facility would extend the scope of immunity and create an "incentive to release a patient under questionable circumstances because there is no possibility that the medical professional will be held responsible for a medical error." She also expresses a concern that a patient could "receive an incorrect dosage of medicine (or the wrong medicine altogether) leading to his or her death [and the physician who prescribed the medication] would be immune from liability due to its occurrence during the involuntary admission period." However, while statutory immunity applies to decisions relating to admission, including a decision to release an individual, it does not insulate decisions relating to the treatment of the individual while at the facility.[22] Moreover, it applies only if the decision to admit or to release is made "in good faith and with reasonable grounds."

2.      In Good Faith and With Reasonable Grounds

The phrase "in good faith" refers to the subjective intent or belief of a person at the time the person acts or makes a decision. The action may be misguided or the belief may

---

[22] Part III of Subtitle 6 does not mandate any particular course of treatment, and thus any particular treatment – or lack of treatment – of the individual by the facility or a physician would not be "acting in compliance with Part III" such that it would be immunized conduct. *Cf. Crise v. Maryland General Hospital*, 212 Md. App. 492 (2013).

be objectively incorrect, but the person acting or making the decision can still be acting "in good faith" if he or she actually holds that belief or makes the decision without actual knowledge of his or her error. *See Rite Aid Corp. v. Hagley*, 374 Md. 665, 680-83 (2003) (in the context of construing another immunity statute, defining "good faith" as to "act with an honest intention"); *see also* Black's Law Dictionary (9th ed. 2009) at 762 (defining "good faith" as "a state of mind consisting in … honesty in belief or purpose").

The phrase "with reasonable grounds" may suggest that there is also an objective aspect to the standard – *i.e.*, that the facility or person must have acted "reasonably." However, as the Court of Special Appeals explained in its decision in the *Williams* case, that cannot be the meaning of "with reasonable grounds" in CJ §5-623. If that were the case, a person would only have immunity if he or she acted reasonably – that is, if the person was not negligent and therefore did not need immunity. *See* 213 Md. App. at 660-62. Under that interpretation, the immunity statutes would provide the same protection from liability that the sleeves of a vest provide from sunburn. Such an interpretation would render both HG §10-618 and CJ §5-623 nonsensical and essentially meaningless.

As stated earlier, we do not construe statutes to be illogical or meaningless. As the Court of Special Appeals suggested in *Williams*, an appropriate way to construe "with reasonable grounds" would be as a requirement that a facility and its agents and employees have followed the process and relied on the grounds set forth in the statutory provisions. 213 Md. App. at 662 n.9; *cf. Ziemba v. Riverview Medical Center*, 645 A.2d 1276, 1280-81 (N.J.App. 1994) (construing statute conferring immunity with respect to decisions on

30

involuntary commitment when decisionmakers act in good faith and take "reasonable steps"). In other words, there should be a reasoned articulation somewhere in the record that relates the decision to admit or release an individual to the statutory criteria. Thus, immunity does not depend on the merits or reasonableness of a decision to admit – or to release – an individual proposed for involuntary admission, but on whether the process required by the statute was followed and whether the decision, regardless of its merits or reasonableness, was based on the statutory criteria.

3. Summary

In our view, the plain language of the immunity statutes – read in context, illuminated by their legislative history, and considered together with the agency regulations – extends immunity to every stage of the process by which an individual is involuntarily admitted to a mental health facility and at which the facility and its employees must apply the criteria set out in HG §10-617. That process begins with the individual's initial confinement at the facility under an application for involuntary admission and ends with a hearing before an ALJ to determine whether the individual is to be admitted or released.[23]

This reading is consistent with the statute's purpose – protecting individuals from loss of liberty due to an unwarranted involuntary commitment – because it allows for a physician to release an individual without fear of liability when the physician believes that

---

[23] To the extent that Dr. Bell and Bon Secours contend that statutory immunity extends beyond the ALJ hearing that concludes the admission process, we reject that argument.

the individual no longer meets the criteria that justify the restriction of that individual's liberty. Therefore, a physician acting on behalf of the facility who determines, in good faith and with reasonable grounds, that a patient initially confined under an application for involuntary admission no longer fits the criteria of HG §10-617, and releases that patient, acts in compliance with Part III and is immune from civil or criminal liability. The assessment of those criteria need not be correct or done well. All that is required for immunity is that the assessment be done in good faith following the process and applying the criteria in the statute.

## D.    *Application of Immunity Statutes and Disposition of this Appeal*

What effect does our holding have on the disposition of this case?

First, it is clear from the analysis above that statutory immunity potentially covers the decision to release Mr. Mackey on April 9, 2011.[24] Had Mr. Mackey stayed at Bon Secours long enough to have had a hearing and had the ALJ agreed with Dr. Bell that the criteria for involuntary admission were not met, Mr. Mackey would have been "released without being admitted" pursuant to HG §10-632. It cannot be that Dr. Bell's determination that the criteria were not met and that he should be released *before* the hearing somehow means that Mr. Mackey was "admitted" in advance of the hearing. Thus,

---

[24] We thus reject Ms. Chance's arguments that immunity would extend only to the physicians at St. Agnes who provided the certifications required for Mr. Mackey's admission, or, at most, to the circumstances of his entry into Bon Secours and acceptance by that facility.

Dr. Bell and Bon Secours would be immune from liability in this case if the decision to release Mr. Mackey was made "in good faith and with reasonable grounds."

The judgment that is before us on this appeal is the Circuit Court's decision to grant judgment NOV in favor of Dr. Bell and Bon Secours. As indicated earlier, in reviewing such a decision, we consider the evidence and inferences in the light most favorable to the party who prevailed at trial – in this case, Ms. Chance. There is a factual element to immunity – the person or entity claiming protection from liability must have acted in good faith and with reasonable grounds – *i.e.*, followed the statutory process with an honest intention. Thus, there is at least a possibility that, depending on the facts of the particular case, a psychiatrist in Dr. Bell's place and the facility that employs that psychiatrist would not be immune from civil liability. In an appropriate case, the good faith of the defendants could be an issue for determination by the factfinder at trial. *See Hagley, supra*, at 684. In this case, however, the complaint did not allege that bad faith – as opposed to poor judgment – resulted in Mr. Mackey's release.[25] Nor was there any serious contention that that Dr. Bell or Bon Secours failed to follow the steps required by the statute. Rather, the contention is that they made the wrong decision and did so negligently. But that would not be enough to defeat statutory immunity.

---

[25] At trial, Ms. Chance suggested that Dr. Bell's decision to release Mr. Mackey may have been motivated by "financial considerations." The only basis for that contention appears to be Dr. Bell's reference to financial considerations in his testimony, which he explained as a concern that in prescribing a medication for Mr. Mackey post-discharge, he needed to consider what Mr. Mackey would be able to afford. In our view, this would have been insufficient for a jury finding of bad faith.

In any event, we agree with the Circuit Court that Dr. Cascella's opinion on the standard of care was inconsistent with Maryland law to the extent that he opined that Dr. Bell's decision to discharge Mr. Mackey, absent bad faith or a lack of reasonable grounds, could be a breach of the standard of care. A decision to discharge a patient, made in good faith and with reasonable grounds, would be immune from liability under HG §10-618 and CJ §5-623; it would thus be illogical to say that that same decision could be the basis for a jury verdict finding liability.

## III

## Conclusion

For the reasons stated above, we hold that the immunity statutes related to involuntary admission of an individual to a mental health facility apply to the entire process of involuntary admission from the initial application for admission to the mandatory ALJ hearing. If a psychiatrist employed by a facility applies the statutory criteria for involuntary admission in good faith and decides to release an individual prior to the ALJ hearing, the psychiatrist and the facility are immune from civil and criminal liability for that decision pursuant to HG §10-618 and CJ §5-623. Accordingly, a jury verdict of negligence may not be based upon an expert opinion that identifies such a decision as a breach of the standard of care.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS IN THE COURT OF SPECIAL APPEALS AND THIS COURT TO BE PAID BY RESPONDENT.**

34